Frederick D. PEEL, Plaintiff-Appellee,

v.

FLORIDA DEPARTMENT OF TRANSPORTATION, Tom B. Webb, Jr., as Secretary, Defendants-Appellants.

No. 77–1846.

United States Court of Appeals, Fifth Circuit.

Aug. 13, 1979.

George L. Waas, Gen. Counsel, State of Florida, H. Reynolds Sampson, John J.

Rimes, III, Dept. of Transp., Tallahassee, Fla., for defendants-appellants.

Donald S. Modesitt, Asst. U. S. Atty., N. D. Fla., Tallahassee, Fla., William H. Berger, U. S. Dept. of Labor, Atlanta, Ga., Leonard Schaitman, Atty., Appellate Section Civil, Div. Dept. of Justice, Washington, D. C., Bobbye D. Spears, Regional Sol., Dept. of Labor, Atlanta, Ga., for plaintiff-appellee.

Before TJOFLAT and HILL, Circuit Judges, and HIGGINBOTHAM,* District Judge.

TJOFLAT, Circuit Judge:

This case requires us to decide whether the tenth amendment[1] or the eleventh amendment[2] prevents a federal court from ordering a state agency to reinstate a former employee under the Veterans' Reemployment Rights Act (the Act), 38 U.S.C. §§ 2021–2026 (1976),[3] passed pursuant to the war power of Congress.[4] The district

---

* District Judge of the Northern District of Texas, sitting by designation.

1. U.S.Const. amend. X provides:

 The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.

2. U.S.Const. amend. XI provides:

 The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

3. Section 2022 of the Act authorizes a person covered by the Act to bring an action in federal court to enforce the reinstatement rights granted by the Act.

 If any employer, who is a private employer or a State or political subdivision thereof, fails or refuses to comply with the provisions of section 2021(a), (b)(1), or (b)(3), or section 2024, the district court of the United States for any district in which such private employer maintains a place of business, or in which such State or political subdivision thereof exercises authority or carries out its func-

tions, shall have the power, upon the filing of a motion, petition, or other appropriate pleading by the person entitled to the benefits of such provisions, specifically to require such employer to comply with such provisions and to compensate such person for any loss of wages or benefits suffered by reason of such employer's unlawful action. . . .

4. U.S.Const. art. I, § 8 provides, inter alia:

 The Congress shall have Power To . . . provide for the common Defence and general Welfare of the United States; . . .

 . . . . .

 To declare War, . . .
 To raise and support Armies, . . .
 To provide and maintain a Navy;
 To make Rules for the Government and Regulation of the land and naval Forces; . . .

 . . . . .

 To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, . . .

 . . . . .

 To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers . . . .

court granted plaintiff Frederick D. Peel's motion for summary judgment, ruling that the defendants, the Florida Department of Transportation (DOT) and its Secretary, had violated the Act by terminating Peel's employment; the court ordered that Peel be reinstated and compensated for lost wages and benefits. *Peel v. Florida Department of Transportation*, 443 F.Supp. 451 (N.D.Fla.1977). The DOT and the Secretary contend that Peel's suit is barred by the tenth and eleventh amendments. We reject their contentions and affirm.

## I

Peel was a permanent full-time employee of the DOT for more than three and one-half years. The DOT was and continues to be an agency of the state of Florida. Prior to September 5, 1975, Peel had used for reserve military duty fourteen of the seventeen days allotted annually for military leave under Florida law.[5] On that date, Peel requested military leave after receiving orders for full time training duty with the national guard for the period September 9, 1975, to November 6, 1975. The request was denied, but Peel nevertheless reported as ordered for training duty.

By letter dated September 16, 1975, the DOT advised Peel that he had been discharged, since he was deemed to have abandoned his position under Florida Department of Administration Rule 22A–7.10(B) by virtue of his absence for three consecutive workdays without authorized leave.

On November 7, 1975, after completing his training with the national guard, Peel applied for reemployment. The DOT refused and has continued to refuse reemployment.

Peel instituted this action on October 8, 1976, to secure reemployment and to receive lost wages and benefits. The defendants moved to dismiss the complaint on various grounds, including that the action was barred by the tenth and eleventh amendments. The motion was considered in conjunction with the parties' reciprocal motions for summary judgment made on a joint stipulation of facts and was denied when the district court entered summary judgment for Peel. This appeal followed, and a stay of the judgment was granted. Only the tenth and eleventh amendment issues are before this court.

## II

In 1974, Congress extended veterans' reemployment rights to employees of state and local governments and authorized enforcement actions against the states and their political subdivisions. Act of Dec. 3, 1974, Pub.L. No. 93–508, 88 Stat. 1594 (codified at 38 U.S.C. §§ 2021–26 (1976)). By doing this, Congress provided state and local government employees with reemployment rights that previously had been given to other veterans who had left their civilian jobs to serve in the armed forces, including the national guard.[6] Although states are free to establish additional rights and protections supplemental to those the Act pro-

---

5. Fla.Stat. § 115.07 (1977) provides:

 All officers or employees of this state, or of the several counties or municipalities of this state, who are commissioned reserve officers or reserve enlisted personnel in the United States military or naval service or members of the National Guard, shall be entitled to leave of absence from their respective duties, without loss of pay, time or efficiency rating, on all days during which they shall be engaged in field or coast defense exercise or other training ordered under the provisions of the United States military or naval training regulations for such personnel when assigned to active duty; provided that leaves of absence granted as a matter of legal right under the provisions of this section shall not exceed 17 days in any one annual period; provided,

 further, that leaves of absence for additional or longer periods of time without pay for assignment to duty with civilian conservation corps units or other functions of military character may be granted in the discretion of employing or appointing authority of any state, county or municipal employee and when so granted shall have the force and effect of other leaves of absence authorized by this section.

6. Reemployment rights have been granted to veterans since the Selective Training and Service Act of 1940, c. 720, § 8, 54 Stat. 890 (1940) (expired 1947). Full reemployment rights for reservists and national guardsmen who perform short-term training duty are presently provided by 38 U.S.C. §§ 2021(b)(3) and 2024(d) (1976).

vides, 38 U.S.C. § 2021(a) (1976), they are not free to restrict the reemployment rights that the Act has created.

The district court found that the constitutional basis for the Act flowed from Congress's war power. In addition, the court ruled that the Act applied to Peel and that the termination of his employment and the denial of reemployment were in violation of the Act. 443 F.Supp. at 454–55. Relying upon the supremacy clause, U.S.Const. art. VI, cl. 2,[7] the court determined that the provisions of the Act preempted the Florida statute that limited Peel's right to military leave to seventeen days annually.

### III

The two issues presented in this appeal are whether an otherwise valid congressional exercise of the war power is rendered unenforceable by either the tenth or the eleventh amendment. We will treat them in reverse order.

### A. *The Eleventh Amendment*

■ We first address the eleventh amendment issue, since it concerns the threshold question of whether a federal court may entertain this suit. Although Congress has the power under its war power and the necessary and proper clause, see note 4 *supra,* to provide for the nation's defense, the eleventh amendment limits the power of the federal judiciary to enforce private actions against the states. While the language of the amendment limits the judicial power with regard to suits against a state by citizens of another state or by citizens or subjects of any foreign state, its limitation has been interpreted to extend to suits against a state by its own citizens. *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890).[8] Peel is a Florida citizen and his suit is a suit against the state, since the Florida DOT is a component of the state government. *State v. Love,* 99 Fla. 333, 126 So. 374 (1930). In addition, where, as here, the liability for back wages and benefits under the Act must be paid from public funds in the state treasury, the eleventh amendment may also serve as a bar. *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 1356, 39 L.Ed.2d 662 (1974); *Jagnandan v. Giles,* 538 F.2d 1166, 1176 (5th Cir. 1976), *cert. denied,* 432 U.S. 910, 97 S.Ct. 2959, 53 L.Ed.2d 1083 (1977).

Appellants urge us to reverse the district court and find that the state of Florida is immune from suit and has not waived its immunity. Although the relationship between congressional authorization of suits against a state and the necessity of a state's consent to suit has created confusion concerning the contours of the immunity that a state enjoys,[9] the development of the law involving the eleventh amendment leads us to conclude that this action could properly be brought in federal court. We endeavor

---

7. This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

8. Although there is debate as to whether this extension of a state's immunity to suits by its own citizens is incorporated into the eleventh amendment or is based solely on the doctrine of sovereign immunity, *compare Employees of Dept. of Pub. Health & Welfare v. Department of Pub. Health & Welfare,* 411 U.S. 279, 280 n. 1, 93 S.Ct. 1614, 1616, 36 L.Ed.2d 251 (1973) *with id.* at 309–15, 93 S.Ct. at 1630–33 (Brennan, J., dissenting), we need not address the issue since under our interpretation of the law

in this area, neither theory would prevent Congress from explicitly authorizing a suit against the state.

9. Various commentators have discussed the interrelationship between the power and intent of Congress to subject states to private suits in federal court and the requirement of state consent to be sued. *See* Field, *The Eleventh Amendment and Other Sovereign Immunity Doctrines: Congressional Imposition of Suit Upon the States,* 126 U.Pa.L.Rev. 1203 (1978); Nowak, *The Scope of Congressional Power to Create Causes of Action Against State Governments and the History of the Eleventh and Fourteenth Amendments,* 75 Colum.L.Rev. 1413 (1975); Tribe, *Intergovernmental Immunities in Litigation, Taxation, and Regulation: Separation of Powers Issues in Controversies About Federalism,* 89 Harv.L.Rev. 682 (1976).

to examine the cases in this area to trace this development.

■ Where a state consents to being sued, neither the eleventh amendment nor the doctrine of sovereign immunity is a bar. *See Petty v. Tennessee-Missouri Bridge Commission*, 359 U.S. 275, 79 S.Ct. 785, 3 L.Ed.2d 804 (1959); *Clark v. Barnard*, 108 U.S. 436, 2 S.Ct. 878, 27 L.Ed. 780 (1883). In the absence of an express consent by a state to be sued, federal courts have still attempted to find some type of implied or constructive consent by the state to avoid the limitations of the eleventh amendment. Thus, in *Parden v. Terminal Railway*, 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964), the Court found that the state of Alabama, by its conduct in operating a railroad, had consented to suit in federal court under the Federal Employers' Liability Act (FELA), 45 U.S.C. §§ 51–60 (1976). In *Parden*, employees brought an FELA personal injury suit for damages against an Alabama-owned interstate railroad. The Court first examined whether Congress had intended to include state-owned as well as privately-owned rail carriers under the coverage of the FELA. Although there was no language in the FELA specifically authorizing suits against a state, Congress had made the FELA applicable to "every" interstate rail carrier, thus including the Alabama-owned railroad within its coverage.

After finding that the state-owned railroad was within the coverage of the FELA, the Court next examined whether Congress had the power to subject Alabama to suit in light of the state's sovereign immunity. Justice Brennan, writing for a five-member majority, found that by empowering Congress to regulate commerce, "the States necessarily surrendered any portion of their sovereignty that would stand in the way of such regulation." 377 U.S. at 192, 84 S.Ct. at 1212. However, the majority opinion then went on to explain that the eleventh amendment was not being overridden, since a state still could not be sued by an individual without its consent. The Court concluded that Alabama had consented to a suit under the FELA by its continued operation of an interstate railroad for approximately twenty years after Congress had made such railroads subject to suit under the FELA.

Four Justices disagreed with the quality of statutory notice that was necessary before Congress could make the states subject to suit through their implied consent.

> It should not be easily inferred that Congress, in legislating pursuant to one article of the Constitution, intended to effect an automatic and compulsory waiver of rights arising out of another. Only when Congress has clearly considered the problem and expressly declared that any state which undertakes given regulable conduct will be deemed thereby to have waived its immunity should courts disallow the invocation of this defense.
>
> . . . If the automatic consequence of state operation of a railroad in interstate commerce is to be waiver of sovereign immunity, Congress' failure to bring home to the State the precise nature of its option makes impossible the "intentional relinquishment or abandonment of a known right or privilege" which must be shown before constitutional rights may be taken to have been waived. *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461; *Fay v. Noia*, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837.

*Id.* at 198–200, 84 S.Ct. at 1216–17 (White, J., dissenting). Despite the difference between the majority and dissenters regarding the need for express congressional authorization for suits against the state, the *Parden* Court recognized that where Congress under its commerce power had authorized private suits against a state engaging in certain conduct and the state continued that conduct, the state necessarily had consented to be sued.

*Employees of the Department of Public Health & Welfare v. Department of Public Health & Welfare*, 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973), was the next case to confront the Court with a conflict between a congressionally-created cause of action and a state's claim of sovereign immunity. There, state hospital and training

school employees brought suit against the state of Missouri for overtime compensation, liquidated damages, and attorneys' fees under the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201–19 (1976). The Court held that although the FLSA literally included the plaintiffs, Congress had not expressly "brought the States to heel, in the sense of lifting their immunity from suit in a federal court" by explicitly making them subject to suit. *Id.* at 283, 93 S.Ct. at 1617. *Parden* was distinguished as an isolated case of state activity conducted for profit, where a lesser showing of congressional authorization for suit was acceptable. Although recognizing that Congress had the power under the commerce clause to further national policy goals in a manner that may "place new or even enormous fiscal burdens on the States," *id.* at 284, 93 S.Ct. at 1618, the Court concluded that

> [i]t is not easy to infer that Congress in legislating pursuant to the Commerce Clause . . . desired silently to deprive the States of an immunity they have long enjoyed under another part of the Constitution. Thus, we cannot conclude that Congress conditioned the operation of these facilities on the forfeiture of immunity from suit in a federal forum.

*Id.* at 285, 93 S.Ct. at 1618. *Employees,* then, followed an approach similar to that taken by the dissenters in *Parden,* implicitly acknowledging the dual role between congressional authorization, although now more explicit, and a state's consent.

Justice Marshall, joined by Justice Stewart, concurred in the result in a separate opinion. They felt the proper analysis of the case required consideration of two distinct questions: (1) whether Congress had effectively lifted the state's protective veil of sovereign immunity, and (2) whether the federal judicial power extended to a suit against the state even if Congress had removed the state's immunity. In their view, the majority opinion conveyed the impression that the two questions were a single inquiry. In answering the first question, the concurrence observed that the states had surrendered part of their sovereignty to the federal government when the Union

was formed, thereby allowing Congress to remove their immunity from suit. This, in the concurring Justices' view, Congress had done under the FLSA. However, in answering whether the federal judiciary could enforce against a state rights created under the FLSA, the Justices would not have found that Missouri had given the requisite consent to allow federal court enforcement.

> Here the State was fully engaged in the operation of the affected hospitals and schools at the time [the FLSA was made applicable to them]. To suggest that the State had the choice of either ceasing operation of these vital public services or "consenting" to federal suit suffices, I believe, to demonstrate that the State had no true choice at all and thereby that the State did not voluntarily consent to the exercise of federal jurisdiction in this case.

*Id.* at 296, 93 S.Ct. at 1624. Justices Marshall and Stewart read the Court's opinion as merging the two inquiries, focusing mainly on the power of Congress to lift a state's immunity from suit without adequately considering the need for a state's consent to suit. This reading would later prove accurate.

The next major case to consider the effect of the eleventh amendment was *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), a class action against Illinois officials who were administering programs of Aid to the Aged, Blind, or Disabled (AABD). Plaintiffs charged that state officials were delaying the processing of welfare benefits applications in violation of federal regulations under the Social Security Act, resulting in the wrongful withholding of welfare benefits. The Court allowed purely prospective injunctive relief on the basis of *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), but found that the eleventh amendment barred the award of any retroactive payment of the wrongfully withheld statutory benefits. Justice Rehnquist, writing for the majority, criticized the court of appeals's application of the doctrine of constructive consent to find that Illinois, by participating in the

AABD program, had waived its eleventh amendment immunity.[10]

Both *Parden* and *Employees* involved a congressional enactment which by its terms authorized suit by designated plaintiffs against a general class of defendants which literally included States or state instrumentalities. . . . The question of waiver or consent under the Eleventh Amendment was found in those cases to turn on whether Congress had intended to abrogate the immunity in question, and whether the State by its participation in the program authorized by Congress had in effect consented to the abrogation of that immunity.

But in this case the threshold fact of congressional authorization to sue a class of defendants which literally includes States is wholly absent. . . .

. . . Constructive consent is not a doctrine commonly associated with the surrender of constitutional rights, and we see no place for it here. In deciding whether a State has waived its constitutional protection under the Eleventh Amendment, we will find waiver only where stated "by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction." *Murray v. Wilson Distilling Co.,* 213 U.S. 151, 171, 29 S.Ct. 458, 464, 53 L.Ed. 742 (1909). We see no reason to retreat from the Court's statement in *Great Northern Life Insurance Co. v. Read,* 322 U.S. [47], at 54, 64 S.Ct. 873, 877, 88 L.Ed. 1121 (footnote omitted):

"[W]hen we are dealing with the sovereign exemption from judicial interference in the vital field of financial administration a clear declaration of the state's intention to submit its fiscal problems to other courts than those of its own creation must be found."

The mere fact that a State participates in a program through which the Federal Government provides assistance for the operation by the State of a system of public aid is not sufficient to establish consent on the part of the State to be sued in the federal courts.

*Edelman v. Jordan,* 415 U.S. at 672–73, 94 S.Ct. at 1360–61.[11] While again recognizing the need for a state's consent to be sued, language in the opinion hinted at the sufficiency of explicit congressional authorization alone. In finding that the only sanction in the Social Security Act against noncomplying states was the termination of federal funds, the Court concluded that "[t]his provision by its terms did not authorize suit against anyone, and standing alone, fell far short of a waiver by a participating State of its Eleventh Amendment immunity." *Id.* at 674, 94 S.Ct. at 1361.

The Court's language in *Edelman* strongly implies that Congress can force a constructive consent by a state whenever Congress specifically authorizes private actions against the state. This approach expressly was taken by the Court in *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), where male state employees sued the state of Connecticut alleging sex-based employment discrimination in

10. The court of appeals, 472 F.2d 985 (7th Cir. 1973), had relied upon the Court's holding in *Parden* and the dissenting opinion to the court of appeals decision in *Employees,* 452 F.2d 820, 827 (8th Cir. 1971) (Bright, J., dissenting), to find that a state could waive its immunity by constructive, as well as actual, consent.

11. Four Justices disagreed with the result reached by the majority. Justice Douglas saw the award of retroactive relief against the state as entirely consistent with prior rulings by the Court and regarded the state's participation in a federal-state cooperative project as sufficient consent by the state to assume the obligations under the program. 415 U.S. at 678–687, 94 S.Ct. at 1363–67. In Justice Brennan's view,

the only issue was whether Illinois could assert its sovereign immunity, rather than the eleventh amendment, as a bar; he concluded that Illinois had surrendered such immunity when the Union was formed. Therefore, no immunity existed that required either express congressional authorization of suit or a consent by the state. *Id.* at 687–88, 94 S.Ct. at 1367–68. Justice Marshall, joined by Justice Blackmun, found sufficient congressional authorization in 42 U.S.C. § 1983 suits, and also determined that the state's voluntary participation in and agreement to comply with the AABD program was a waiver of the state's eleventh amendment immunity. *Id.* at 688–696, 94 S.Ct. at 1368–72.

the state's statutory retirement benefit plan. The employees sought both prospective and retroactive relief and attorneys' fees under the 1972 amendments to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17 (1976). The case squarely presented the question whether section 5 of the fourteenth amendment empowered Congress to authorize federal courts to assess money damages against a state in favor of private individuals despite the shield of the eleventh amendment. Justice Rehnquist, again writing for the Court, found that the prerequisite congressional authorization to sue the state was clearly present in the amendments making Title VII of the Civil Rights Act applicable to state and local governments. The Court focused on the source of the congressional power, relying upon the powers given Congress under section 5 to enforce the substantive provisions of the fourteenth amendment.

> [Supreme Court cases have] sanctioned intrusions by Congress, acting under the Civil War Amendments, into the judicial, executive, and legislative spheres of autonomy previously reserved to the States. The legislation considered in each case was grounded on the expansion of Congress' powers—with the corresponding diminution of state sovereignty—found to be intended by the Framers and made part of the Constitution upon the States' ratification of those Amendments, a phenomenon aptly described as a "carv[ing] out" in *Ex parte State of Virginia* [100 U.S. 339, 346, 25 L.Ed. 676, 679 (1880)].

*Fitzpatrick v. Bitzer*, 427 U.S. at 455–56, 96 S.Ct. at 2671. The necessity for a state's consent to suit was not addressed specifically, since the inherent cession of state sovereignty to Congress in the passage of the fourteenth amendment, coupled with the express congressional authorization, superseded the eleventh amendment bar. The

Court did suggest, without explanation, that this analysis could be unique to the Civil War amendments:

> We think that Congress may, in determining what is "appropriate legislation" for the purpose of enforcing the provisions of the Fourteenth Amendment, provide for private suits against States or state officials which are constitutionally impermissible in other contexts. See *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed. 662 (1974); *Ford Motor Co. v. Department of Treasury*, 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945).[12]

*Id.* at 456, 96 S.Ct. at 2671 (footnote omitted). Such an approach would be logical in that the states would have consented to suit in federal court through their ratification of the fourteenth amendment, making the eleventh amendment no bar whatsoever. In essence, then, the only question would be one of statutory construction as to whether Congress intended to make the states amenable to private damage actions. While this approach is logically appealing, later cases have undermined its rationale.

Section 5 of the fourteenth amendment again was relied upon by Congress in passing the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988 (1976), authorizing fee awards against the states when state officials were sued in their official capacities. The Court addressed the amenability of states to these fee awards in *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), a suit by prison inmates contesting the conditions of their confinement under the eighth and fourteenth amendments. Even though no explicit statutory language imposed liability upon the states, Justice Stevens, joined by four other Justices, found that the legislative history indicated an intent by Congress to make the states liable for these litigation expenses. The Court's approach, however, went beyond mere statutory interpretation.

---

**12.** The cases cited by the Court involved suits lacking explicit congressional authorization of private damage actions against the states. Later, in *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), discussed *infra*, the Court used the rationale of *Fitzpatrick* to

bolster its finding of sufficient congressional authorization to impose attorneys' fees against the states even though no explicit congressional authorization existed. *Id.* at n.31, 98 S.Ct. at 2578.

Instead, the Court considered Congress's plenary power under section 5 to *abrogate* a state's eleventh amendment immunity. If statutory interpretation were the only consideration, the focus would have been to determine if Congress intended the statute to apply to the states; there would be no need to address the eleventh amendment issue. If Congress still needed intentionally to *abrogate* the state's eleventh amendment immunity, however, the ratification of the Civil War amendments had not already done so. Thus, the Court acknowledged that the eleventh amendment could still bar suit in federal court where Congress had acted under section 5. The inquiry, then, turned to how clearly Congress had intended to abrogate the state's eleventh amendment immunity. The majority found that congressional abrogation of a state's immunity did not need to be explicit where only the award of litigation expenses was involved, but implied that the abrogation of a state's immunity would have to be more express where enormous financial consequences to the states might be involved. *Id.* at 697 n.27, 98 S.Ct. at 2577. Again, the necessity for a state's consent was not addressed.[13]

Only recently the Court again addressed the question of congressional abrogation of a state's immunity in *Quern v. Jordan*, —— U.S. ——, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979), the sequel to *Edelman*. There the issue was whether a federal court could order state officials to send an explanatory notice advising those who had been deprived of their welfare benefits that administrative procedures were available to deter-

mine their rights to past welfare benefits. In reaffirming the watershed between prospective and retroactive relief relied upon in *Edelman*, the Court found that the proposed notice constituted permissible prospective relief and not an unconstitutional retroactive award requiring payment from the state treasury. In so holding, the Court readdressed the argument whether 42 U.S.C. § 1983 (1976), enacted pursuant to section 5 of the fourteenth amendment, constitutes a sufficient congressional authorization to abrogate a state's eleventh amendment immunity. Again the Court, in tracing its holdings from *Employees* through *Hutto*, focused on the explicitness of the congressional purpose to remove a state's immunity from suit. The requisite congressional authorization could not be found in *Quern*.

[Section] 1983 does not explicitly and by clear language indicate on its face an intent to sweep away the immunity of the states; nor does it have a history which focuses directly on the question of state liability and which shows that Congress considered and firmly decided to abrogate the Eleventh Amendment immunity of the States.

—— U.S. ——, 99 S.Ct. at 1147. Even for legislation enforcing the fourteenth amendment, the eleventh amendment barrier remained because Congress had not indicated a sufficient purpose to remove the state's eleventh amendment immunity.

■ With these decisions in mind, we now address the reemployment provisions of the statute before us. We conclude that the Act "shows that Congress considered

13. Justice Powell, joined by the Chief Justice, Justice White and Justice Rehnquist, dissented from the holding permitting counsel fee awards against a state where Congress had not statutorily waived the state's immunity through express language. These Justices, consistent with the majority, saw the eleventh amendment as a bar to this suit, even when Congress had acted pursuant to the fourteenth amendment, but unlike the majority, would have required an explicit waiver. *Id.* at 704, 98 S.Ct. at 2581–84. Justice Rehnquist, joined by Justice White, also dissented on the ability of Congress to enforce constitutional provisions, *e. g.*, the cruel and unusual punishment provision of

the eighth amendment, not specifically contained in the fourteenth amendment by using § 5 of the fourteenth amendment to abrogate a state's immunity. In *Hutto*, he pointed out, the fourteenth amendment was applied solely for the purpose of allowing the plaintiffs' eighth amendment claim to be made against the state; nothing in the plaintiffs' alleged cause of action had its roots in the fourteenth amendment's direct prohibitions against the states. In *Fitzpatrick*, by contrast, the claimed violation was based on the equal protection clause of the fourteenth amendment. *Id.* at 717, 98 S.Ct. at 2588.

and firmly decided to abrogate the Eleventh Amendment immunity of the States." *Id.* Indeed, section 2022 expressly authorizes a suit in federal district court against a state to achieve compliance with the Act and to provide compensation for lost wages and benefits. The "threshold fact of congressional authorization" is clearly present. *Edelman*, 415 U.S. at 672, 94 S.Ct. at 1360.

■ We are well aware that *Fitzpatrick* and *Hutto* involved the power of Congress under section 5 of the fourteenth amendment whereas the Act challenged here is founded on Congress's war power under article I. However, we are persuaded that nothing in the history of the eleventh amendment, the doctrine of sovereign immunity, or the case law indicates that Congress, when acting under an article I, section 8 delegated power, lacks the authority to provide for federal court enforcement of private damage actions against the states.[14]

■ As our analysis of the cases interpreting the eleventh amendment immunity has indicated, the primary focus has been whether Congress has expressed a sufficient desire to subject the states to suit. A finding of the prerequisite voluntary state consent to suit, so essential to a federal court's jurisdiction in the early cases, has been noticeably absent in the Court's recent cases of *Fitzpatrick* and *Hutto*.[15] Although this absence could have been justified on the theory that the legislation in those cases had been passed pursuant to section 5 of the fourteenth amendment, the ratification of which removed the eleventh amendment as a bar, such a rationale is inconsistent with the approach in *Hutto* and *Quern* that Congress must act affirmatively to remove the state's eleventh amendment immunity.

Another possible rationale for the Court's *sub silentio* merging of the separate state

consent requirement into the single inquiry of whether Congress has statutorily waived the state's immunity is that in every case the state necessarily continued the conduct covered by the statute, thus furnishing the grounds for the suit against the state. From this perspective, a state that continued such conduct would have consented to suit whenever the statute was found to have authorized suits against it. In this case, the state of Florida would be found to have consented to suit by continuing to employ Peel after being put on notice by the Act that employees must be rehired upon their return from military training. A finding of a state's waiver of its immunity in this manner, however, is a far cry from the voluntary consent suggested by the Court in its earlier decisions.

A more consistent rationale is that a state consents to private damage actions when *Congress* manifests a sufficient purpose to abrogate a state's immunity. Under this approach, the state waived its immunity from suit in federal court at the same time it surrendered its sovereign immunity and gave Congress the power to legislate under delegated powers. As recognized by Chief Justice Hughes in an early case involving sovereign immunity, "States of the Union, still possessing attributes of sovereignty, shall be immune from suits, without their consent, save where there has been 'a surrender of this immunity in the plan of the convention.'" *Monaco v. Mississippi*, 292 U.S. 313, 322–23, 54 S.Ct. 745, 748, 78 L.Ed. 1282 (1934) (quoting The Federalist No. 81 (A. Hamilton)) (footnote omitted). This rationale removes the eleventh amendment as a bar whenever Congress validly has exercised its powers.

"[I]n exercising her rights, a State cannot disregard the limitations which the Fed-

---

**14.** This conclusion is supported by commentators, who have concluded that the eleventh amendment should be read as a limitation on the judicial power to imply private damage remedies, but not as a constraint on valid exercises of congressional powers. *See* Field, *supra* note 9, at 1239; Nowak, *supra* note 9, at 1442; Tribe, *supra* note 9, at 693–94.

**15.** A voluntary state consent to suit may still be essential where Congress has not indicated a sufficient intent to abrogate a state's immunity but has made legislation literally applicable to the state. *See Edelman*, 415 U.S. at 673, 94 S.Ct. at 1360–61; *Employees*, 411 U.S. at 283, 93 S.Ct. at 1617. In such a case, the state could still voluntarily consent to suit by a private litigant.

eral Constitution has applied to her power. Her rights do not reach to that extent. Nor can she deny to the general government the right to exercise all its granted powers, though they may interfere with the full enjoyment of the rights she would have if those powers had not been thus granted. Indeed, every addition of power to the general government involves a corresponding diminution of the governmental powers of the States. It is carved out of them."

*Fitzpatrick*, 427 U.S. at 454–55, 96 S.Ct. 2670–71 (quoting *Ex parte Virginia*, 100 U.S. 339, 346–48, 25 L.Ed. 676 (1880)). Congress still must indicate a sufficient intent to subject the states to suit. Hence, this approach construes the eleventh amendment as a check on the judicial power to imply private damage remedies against the states without sufficient congressional action.

██ In both *Parden* and *Employees*, the Court recognized that Congress has the power to bring "the States to heel, in the sense of lifting their immunity from suit in a federal court," *Employees*, 411 U.S. at 283, 93 S.Ct. at 1617, under another article I power, the commerce clause. Similarly, Congress should be able to remove a state's eleventh amendment immunity under its war power. The responsibility for the defense of the Union was delegated to Congress. "The war power of the federal government is its supreme power. When it is in action it is transcendent." *St. Johns River Shipbuilding Co. v. Adams*, 164 F.2d 1012, 1015 (5th Cir. 1947). To hold that the eleventh amendment bars Peel's claim in this case would be to remove the states from the reach of any legitimate exercise of one of the central powers given by the states to the federal government.

'[T]he Constitution is not self-destructive. In other words, that power which it confers on the one hand it does not immediately take away on the other . . . .' [*Billings v. United States*, 232 U.S. 261, 282, 34 S.Ct. 421, 424, 58 L.Ed. 596 (1914)] . . . . [I]t may be said that the power has been expressly given to Congress to prosecute war, and to pass all laws which shall be necessary and proper for carrying that power into execution. That power explicitly conferred and absolutely essential to the safety of the Nation is not destroyed or impaired by any later provision of the constitution or by any one of the amendments. These may be construed so as to avoid making the constitution self-destructive, so as to preserve the rights of the citizen from unwarrantable attack, while assuring beyond all hazard the common defense and the perpetuity of our liberties. These rest upon the preservation of our nation.

*Lichter v. United States*, 334 U.S. 742, 781, 68 S.Ct. 1294, 1314–15, 92 L.Ed. 1694 (1948) (quoting an address by Hon. C. Hughes) (emphasis added). Here, the Act authorizing suit against the state was within the legitimate scope of the war power, since Congress was providing veterans with assistance in readjusting to civilian life. *See Johnson v. Robinson*, 415 U.S. 361, 377, 94 S.Ct. 1160, 1170–71, 39 L.Ed.2d 389 (1974); *Carter v. United States*, 32 U.S.App.D.C. 303, 308, 407 F.2d 1238, 1243 (1968). Accordingly, the Act's authorization of enforcement suits is not barred by the eleventh amendment.

██ Our result is consistent with that reached by other courts that have addressed the ability of Congress under its war power to subject states to private suits by its own citizens. *See Jennings v. Illinois Office of Education*, 589 F.2d 935 (7th Cir.), *cert. denied*, —— U.S. ——, 99 S.Ct. 2417, 60 L.Ed.2d 1073 (1979); *Moore v. Kansas*, No. 78–1079 (D.Kan. May 31, 1979); *Camacho v. Public Service Commission*, 450 F.Supp. 231 (D.P.R.1978); *Schaller v. Board of Education*, 449 F.Supp. 30 (N.D.Ohio 1978). Whether we maintain the fiction that Congress has compelled a state's "consent" to suit or conclude that consent is unnecessary when Congress has explicitly abrogated a state's immunity, the result in this case is the same: the express language in the Act authorizing suits against the states is sufficient to overcome the potential bar of the eleventh amendment. Because we hold that Congress expressly lifted the state of

Florida's eleventh amendment immunity in this case, we need not distinguish between retroactive and prospective relief. Both the award of lost wages and benefits and the reinstatement of Peel are appropriate forms of relief authorized by Congress. *See Fitzpatrick*, 427 U.S. at 456–57, 96 S.Ct. at 2671–72.

B. *The Tenth Amendment*

Although we have concluded that the eleventh amendment is not a limitation where Congress, acting pursuant to its war power, has lifted the state's immunity, we now must turn to the related issue of whether the tenth amendment is a limitation on the exercise of this same power. The tenth amendment reserves to the states all powers that are neither delegated to the United States nor prohibited to the states.

> While the Tenth Amendment has been characterized as a "truism," stating merely that "all is retained which has not been surrendered," . . . it is not without significance. The Amendment expressly declares the constitutional policy that Congress may not exercise power in a fashion that impairs the States' integrity or their ability to function effectively in a federal· system.

*Fry v. United States*, 421 U.S. 542, 547 n.7, 95 S.Ct. 1792, 1795–96, 44 L.Ed.2d 363 (1975) (citation omitted).

Appellants argue that the principles of federalism inherent in the tenth amendment as articulated in *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), require us to invalidate the extension of the reemployment provisions of the Act to state and local governments. In *National League of Cities*, the Court recognized that the tenth amendment prohibited an otherwise valid exercise of congressional power because Congress had attempted "to directly displace the States' freedom to structure integral operations in areas of traditional governmental functions." *Id.* at 852, 96 S.Ct. at 2474. At issue was the validity of the· 1974 amendments to the Fair Labor Standards Act (FLSA), 29 U.S.C. § 203(d), (s)(5),

(x) (1976), which extended the FLSA's minimum wage and maximum hour provisions to almost all employees of states and their political subdivisions. While recognizing that the commerce power under article I is a grant of plenary authority to Congress, the Court distinguished the regulation of private activity from the regulation of states, finding the latter constrained by the constitutional considerations of federalism embodied in the tenth amendment. Because the 1974 amendments would "impermissibly interfere with the integral governmental functions" of the states and their political subdivisions, 426 U.S. at 851, 96 S.Ct. at 2474, the attempted extension of the FLSA was not within the authority granted Congress by the commerce clause.

We are faced with interpreting *National League of Cities* in the context of an otherwise valid exercise by Congress of its war power. This issue was specifically left unresolved in a footnote to the plurality opinion by Justice Rehnquist, although the footnote attempts to distinguish the war power:

> It also seems appropriate to note that *Case v. Bowles*, 327 U.S. 92, 66 S.Ct. 438, 90 L.Ed. 552 (1946), has not been overruled as the dissent asserts. Indeed that decision . . . has no direct application to the questions we consider today at all. For there the Court sustained an application of the Emergency Price Control Act to a sale of timber by the State of Washington, expressly noting that the "only question is whether the state's power to make the sales must be in subordination to the power of Congress to fix maximum prices in order to carry on war." *Id.* at 102, 66 S.Ct. at 443. The Court rejected the state's claim of immunity on the ground that sustaining it would impermissibly "impair a prime purpose of the federal government's establishment." *Ibid.* Nothing we say in this opinion addresses the scope of Congress' authority under its war power.

*Id.* at 854 n.18, 96 S.Ct. at 2475–76. Similarly, the Court was careful to state that it remained open on the question of the extent to which Congress could properly af-

fect integral state functions under its spending power or section 5 of the fourteenth amendment. *Id.* at 852 n.17, 96 S.Ct. at 2474.

In light of these qualifications, *National League of Cities* has been interpreted as an attempt to limit the commerce power rather than all the powers delegated to Congress. *See, e.g., City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 423, 98 S.Ct. 1123, 1142, 55 L.Ed.2d 364 (1978) (Burger, C. J., concurring); *Marshall v. Owensboro-Daviess County Hospital*, 581 F.2d 116, 119 (6th Cir. 1978); *United States v. City of Chicago*, 573 F.2d 416, 424 (7th Cir. 1978); *Arritt v. Grisell*, 567 F.2d 1267, 1270 (4th Cir. 1977). However, since the Court left unanswered the effect of the tenth amendment on the exercise of Congress's war power, we must examine this issue.

The policies of federalism underlying the decision in *National League of Cities* likewise must be considered when an exercise of the congressional war power may "directly displace the State's freedom to structure integral operations in areas of traditional governmental functions." 426 U.S. at 852, 96 S.Ct. at 2474. In determining whether the congressional action violates the limitations of the tenth amendment, we must assess and weigh the source of the congressional power and the legitimacy of its exercise against the degree to which it interferes with integral governmental functions of the states and political subdivisions. Where the legitimate exercise of a power delegated to Congress outweighs the interference with the state's self-determination in providing its essential public services, the tenth amendment is no bar to congressional action.

Here we must balance the exercise of Congress's war power against the impact of the Act's reemployment provisions on Florida's integral governmental functions. These functions include Florida's ability to structure employer-employee relationships in

 such areas as fire prevention, police protection, sanitation, public health, and parks and recreation. These activities

are typical of those performed by state and local governments in discharging their dual functions of administering the public law and furnishing public services. *Id.* at 851, 96 S.Ct. at 2474. Overseeing the transportation system of the state has traditionally been one of the functions of state government, and thus appears to be within the activities protected by the tenth amendment. *Cf. United States v. Best*, 573 F.2d 1095, 1102–03 (9th Cir. 1978) (licensing of drivers constitutes an integral state function). *But cf. Friends of the Earth v. Carey*, 552 F.2d 25, 38–39 (2d Cir.) (regulation of traffic on roads and highways to control air pollution is joint effort among federal, state, and local governments and therefore cannot be considered an integral state governmental function), *cert. denied*, 434 U.S. 902, 98 S.Ct. 296, 54 L.Ed.2d 188 (1977). It also cannot be denied that the Act somewhat affects the state's ability to structure its employer-employee relationships. In balancing the interference with the state's ability to function effectively in our federal system against this exercise of Congress's war power, however, we are not convinced that the reemployment provisions of the Act "directly displace the States' freedom to structure integral operations in areas of traditional functions."

In *National League of Cities*, the Court considered the serious financial strains that the states and municipalities would have suffered if Congress could have extended the minimum wage and maximum hour requirements to nearly all their employees. These additional costs, the Court noted, would have resulted in a "forced relinquishment of important governmental activities." 426 U.S. at 847, 96 S.Ct. at 2472. Moreover, for those services that the state continued to provide, the FLSA requirements would have displaced state policies concerning the manner in which the states could structure the delivery of their services by imposing minimum wage scales and overtime requirements. The type of interference found in *National League of Cities* is not the same as that caused by the reemployment provisions of the Act. The Act

merely prevents the state from denying a person his employment rights because of military obligations, a person whom the state itself had previously hired. *Cf. Hyland v. Fukuda*, 580 F.2d 977, 981 n.5 (9th Cir. 1978) (federal statute which prevents the state's selection of certain persons for prison guards not a violation of the tenth amendment).

■■■■■ Providing reemployment rights for those who have been called to the service of their country is, in our view, a legitimate exercise of Congress's power to raise armies. *See Fishgold v. Sullivan Drydock & Repair Corp.*, 328 U.S. 275, 284, 66 S.Ct. 1105, 1111, 90 L.Ed. 1230 (1946); *cf. Case v. Bowles*, 327 U.S. 92, 66 S.Ct. 438, 90 L.Ed. 552 (1946) (price controls considered valid exercise of war power). The war power, as discussed previously, is one of the vital powers of Congress, essential to the protection of the nation. Where, as in this case, Congress has acted in a direct manner under its war power and has not unduly encroached upon the state's integral governmental functions, the tenth amendment is not a limitation on its power.[16] *Cf. United States v. Oregon*, 366 U.S. 643, 81 S.Ct. 1278, 6 L.Ed.2d 575 (1961); *New York v. United States* (*In re Levy*), 574 F.2d 128, 131 n.6 (2d Cir. 1978) (tenth amendment not violated by federal statute enacted under war power providing that property of veteran who dies intestate and without next of kin while a patient in a veteran's hospital shall vest in the United States).

This balancing approach is consistent with the results reached by other courts that have considered the tenth amendment's relationship to congressional action. As made clear in his concurrence in *National League of Cities*, Justice Blackmun's deciding vote was premised on his understanding that the Court had adopted a balancing approach to determine the validity of federal interference with state functions. 426 U.S. at 856, 96 S.Ct. at 2476.

■■■ When a situation arises that threatens national interests, the federal interest naturally increases. This was the case in *Fry v. United States*, 421 U.S. 542, 95 S.Ct. 1792, 44 L.Ed.2d 363 (1975), where the Court upheld the President's authority under the Economic Stabilization Act of 1970, Pub.L.No.91–379, 84 Stat. 799 (expired 1974) to combat severe inflation by enjoining the state of Ohio from paying statutory wage and salary increases. Because the congressional measure was a response to an emergency situation and whose effectiveness would be drastically impaired if it were inapplicable to state and local governmental employees, the federal intrusion did not violate the tenth amendment. The court in *National League of Cities* found that its holding was entirely consistent with *Fry*, noting that the effect of the price control measures in *Fry* displaced no state choices as to the structure of governmental operations. "Instead, it merely required that wage scales and employment relationships which the states themselves had chosen be maintained during the period of the emergency." 426 U.S. at 853, 96 S.Ct. at 2475. Where collective action becomes necessary to deal with serious national problems, the protected area of state sovereignty must give way to congressional mandate.

■■■ Even nonemergency exercises of the commerce power, the source of the amendments invalidated in *National League of Cities*, outweigh state interests in certain circumstances. In *Friends of the Earth v. Carey*, 552 F.2d 25 (2d Cir.), *cert. denied*, 434 U.S. 902, 98 S.Ct. 296, 54 L.Ed.2d 188 (1977), the Second Circuit found that the enforcement of state plans under the Clean Air Amendments of 1970, 42 U.S.C.A. §§ 7410, 7604 (Supp.1978), neither impermissibly interfered with integral state functions nor usurped state and municipal decisionmaking, even though their enforcement would involve changes in traffic programs, licensing procedures, parking

---

**16.** We do not hold that any exercise of Congress's war power will be immune from the limitations of the tenth amendment. Were Congress to act without a strong nexus to the war power and attempt to displace those activities traditionally left to state and local governments, a different case would be presented.

regulations and would require the city of New York to provide funds for toll facilities and garages. Since the policy choices involved in developing a plan to meet the federal requirements were left to the state and political subdivisions, no impermissible federal interference with state functions was found.

Similarly, this court has upheld the extension of the Equal Pay Act of 1963, 29 U.S.C. § 206(d) (1976), to state and local government employees as a valid exercise of Congress's power under the commerce clause, finding that the intrusion into the area of state sovereignty was permissible. *Pearce v. Wichita County*, 590 F.2d 128 (5th Cir. 1979); *accord, Marshall v. City of Sheboygan*, 577 F.2d 1 (7th Cir. 1978). Other courts have reached the same result, but have placed their reliance on section 5 of the fourteenth amendment as the source of congressional power, finding it not subject to tenth amendment limitation. *Marshall v. Owensboro-Daviess County Hospital*, 581 F.2d 116 (6th Cir. 1978); *Usery v. Charleston County School District*, 558 F.2d 1169 (4th Cir. 1977); *Usery v. Allegheny County Institution District*, 544 F.2d 148 (3d Cir. 1976), *cert. denied*, 430 U.S. 946, 97 S.Ct. 1582, 51 L.Ed.2d 793 (1977). Another court has relied on the fourteenth amendment to uphold the application of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 630(b) (1976) *as amended by* Fair Labor Standards Amendments of 1974, Pub. L.No.93–259, 88 Stat. 55, to state and local governments. *Arritt v. Grisell*, 567 F.2d 1267 (4th Cir. 1977).

Thus, by weighing the legitimate exercise of congressional power against the intrusion into areas of state sovereignty, the courts have determined whether the tenth amendment prevents congressional action. Here, we find the balance in favor of the reemployment provisions of the Act; therefore the tenth, like the eleventh amendment, is no bar to enforcing the remedies provided by the Act. Consequently, the judgment of the district court is

AFFIRMED.