**UNITED STATES of America, Plaintiff, Appellant,**

v.

**COMMONWEALTH OF PUERTO RICO et al., Defendants, Appellees.**

No. 71–1357.

United States Court of Appeals, First Circuit.

Argued Feb. 6, 1973.

Decided May 18, 1973.

Scott P. Crampton, Asst. Atty. Gen., with whom Julio Morales Sanchez, U. S. Atty., Meyer Rothwacks, William Massar, and Jane M. Edmisten, Attys., Tax Division, Department of Justice, were on brief, for appellant.

Ruth Tentori De Lebron-Velazquez, Asst. Sol. Gen. for Commonwealth of Puerto Rico and Jose L. Novas, San Juan, P. R., for Puerto Rico Automobile Accident Compensation Administration, with whom Gilberto Gierbolini Ortiz, Sol. Gen. of Puerto Rico, and Fernando Perez-Colon, San Juan, P. R., Counsel for Puerto Rico Automobile Accident Compensation Administration, were on joint brief, for appellees.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

CAMPBELL, Circuit Judge.

Every person harmed in Puerto Rico as a consequence of maintaining or using a motor vehicle is entitled, regardless of fault, to receive hospital and medical care and to be paid scheduled benefits for dismemberment and other disability.[1] If death ensues, the victim's family and kin are entitled to benefits. Up to stated limits, benefits take the place of what a victim might recover in a tort action against the person responsible for the accident. Tort recovery is permitted, but only above those limits. § 2058.

This "no-fault" plan, enacted in 1970, a year before Massachusetts became the first state to adopt compulsory no-fault insurance, M.G.L. c. 90 § 34A et seq., as amended by St.1970, c. 670 § 1 et seq., is operated by an instrumentality of the Puerto Rico government, a special corporation known as the Automobile Accident Compensation Administration (AACA). § 2060. The AACA is empowered to fix a yearly "premium", which is to be "in accordance with the experience and the corresponding actuarial study." § 2063(4). This is exacted annually from each owner of a registered motor vehicle. It is used solely to compensate victims and for expenses of the no-fault scheme. § 2064(3), (4). The funds may not be used for general revenue purposes.

The United States brought the present action in the district court on behalf of non-resident servicemen stationed in Puerto Rico. Puerto Rico requires all servicemen owning automobiles to pay the annual no-fault premium. They and their families, like all others in Puerto Rico, may share in the plan's benefits. The United States has sought a declaration that the exaction, from non-resident servicemen, is illegal under § 514 of the Soldiers' and Sailors' Civil Relief Act (the Relief Act), 50 U.S.C. App. § 574.[2]

---

1. Automobile Accident Social Protection Act of the Commonwealth of Puerto Rico, 2A Laws of Puerto Rico Ann., Title 9, § 2051 et seq. Property damage is not reimbursable under the plan.

2. § 574. Residence for tax purposes
    (1) For the purposes of taxation in respect of any person, or of his personal property, income, or gross income, by any State, Territory, possession, or political

The district court ruled otherwise. It held that the annual contribution, being neither a "tax" nor a fee paid for the privilege of operating a motor vehicle, was not "forbidden" by § 514. We affirm.

The district court's decision was made upon cross motions for summary judgment. Besides affidavits filed earlier for purposes not here relevant, the court had before it a stipulation of facts. From the court's findings and the undisputed facts, the following appears. The premium is set irrespective of the vehicle's value, and may vary from year to year depending upon past experiences in the administration of the system. In 1970–71 it was fixed by the AACA at $35 per vehicle. A separate $25 license plate fee is charged on registering an automobile in Puerto Rico which servicemen retaining their home state registration need not pay. § 179. (However, the no-fault premium must be paid regardless of place of registration.) Under the no-fault act, § 2064(1), and under the regulations of the Administration, Rule II, Rule 2.1, payment of the premium is made at the time of registration or of renewal of an owner's license. An owner without Puerto Rican registration must have a sticker attached to his plates evidencing payment of the premium; a required transit license is not issued unless the insurance is paid. Rule 2.6. The premium is prorated if the vehicle is brought into Puerto Rico after the beginning of the year or taken out before the end. § 2064(3).

Servicemen for whom this action was brought, residents of the continental United States, are in Puerto Rico solely by reason of military orders. They own motor vehicles, some registered in Puerto Rico, some registered in home states.[3]

---

subdivision of any of the foregoing, or by the District of Columbia, such person shall not be deemed to have lost a residence or domicile in any State, Territory, possession, or political subdivision of any of the foregoing, or in the District of Columbia, solely by reason of being absent therefrom in compliance with military or naval orders, or to have acquired a residence or domicile in, or to have become resident in or a resident of, any other State, Territory, possession, or political subdivision of any of the foregoing, or the District of Columbia, while, and solely by reason of being, so absent. For the purposes of taxation in respect of the personal property, income or gross income of any such person by any State, Territory, possession, or political subdivision of any of the foregoing, or the District of Columbia, of which such person is not a resident or in which he is not domiciled, compensation for military or naval service shall not be deemed income for services performed within, or from sources within, such State, Territory, possession, political subdivision, or District, and personal property shall not be deemed to be located or present in or to have a situs for taxation in such State, Territory, possession, or political subdivision, or district. Where the owner of personal property is absent from his residence or domicile solely by reason of compliance with military or naval orders, this section applies with respect to personal property, or the use thereof, within any tax jurisdiction other than such place of residence or domicile, regardless of where the owner may be serving in compliance with such orders: *Provided*, That nothing contained in this section shall prevent taxation by any State, Territory, possession, or political subdivision of any of the foregoing, or the District of Columbia in respect of personal property used in or arising from a trade or business, if it otherwise has jurisdiction. This section shall be effective as of September 8, 1939, except that it shall not require the crediting or refunding of any tax paid prior to October 6, 1942.

(2) When used in this section, (a) the term "personal property" shall include tangible and intangible property (including motor vehicles), and (b) the term "taxation" shall include but not be limited to licenses, fees, or excises imposed in respect to motor vehicles or the use thereof: *Provided*, That the license, fee, or excise required by the State, Territory, possession, or District of Columbia of which the person is a resident or in which he is domiciled has been paid.

3. From affidavits filed in the district court, we understand that of 4300 privately-owned vehicles registered at Ramey AFB to military personnel, 38% are registered in Puerto Rico; the rest are home-state registered (48%) or registered solely for on-base driving. About 14% of vehicles owned by servicemen at the naval station are registered in Puerto Rico, as are 30% of vehicles owned by other military personnel.

All are insured. Their insurance companies are required by Puerto Rico authorities to issue endorsements to their policies which exclude from coverage thereunder accidents occurring in Puerto Rico to the extent the accident is or would be covered by the Protection Act.[4]

■ While § 514 of the Relief Act has as its chief aim "to prevent multiple State taxation of the property and income of military personnel,"[5] it does not "relieve servicemen from every state tax which is somehow dependent on the presence of personal property within the state." Sullivan v. United States, 395 U.S. 169, 180, 89 S.Ct. 1648, 23 L.Ed.2d 182 (1969).

■ The tax "in respect of" personal property as to which § 514 most plainly grants immunity is the recurring ad valorem property tax. Thus in California v. Buzard, 382 U.S. 386, 86 S.Ct. 478, 15 L.Ed.2d 436 (1966), § 514 was held to exempt a Washington resident from paying a so-called license fee which California sought to impose as a condition to his registering his car in California. While termed a "license fee", the exaction was separate from and in addition to an $8 "registration fee". Calculated at 2% of a motor vehicle's market value, and collected "in lieu of all taxes according to value levied for state or local purposes on vehicles," the tax had been adopted as a substitute for local ad valorem taxation of automobiles. Buzard, supra, 382 U.S. at 389, 395, 86 S.Ct. 478,

n. 9. The tax proceeds went for highway maintenance, a familiar object of tax revenues. See also Snapp v. Neal, State Auditor, et al., 382 U.S. 397, 86 S.Ct. 485, 15 L.Ed.2d 445 (1965) (serviceman exempt from paying ad valorem trailer tax).

Section 514 does not, however, provide exemption from a host state's sales and use taxes. In Sullivan v. United States, supra, the court held that "taxation in respect of" personal property, within the meaning of § 514, means taxes "on" personal property:

The legislative history of the 1942 enactment and the 1944 and 1962 amendments of § 514 reveals that Congress intended the Act to cover only annually recurring taxes on property—the familiar ad valorem personal property tax. Thus, the reports advert to the possibility that servicemen ordered to move around the country—as they were increasingly during World War II—might have their property taxed by more than one state "within the same calendar year". . . . And the reports throughout refer explicitly to "personal-property taxes on property" . . .. 395 U.S. at 176–177, 89 S.Ct. at 1653.

The court also emphasized the absence of any significant risk of double taxation, both because of credit provisions and the taxes' non-recurring nature. See 395 U.S. at 180, 89 S.Ct. 1648.

In the present instance, the United States argues that Puerto Rico's no-fault

---

4. It appears from the affidavits that servicemen get refunds from their insurance companies. However, one officer states in an affidavit that his refund was less than the amount required to be paid under the Puerto Rico plan. Further, two New York servicemen state that New York minimum coverage requirements would force them to continue their coverage while paying for protection under the Puerto Rico plan, and that the plan thus compels them to pay double premiums. New York is one of a relatively few states with a compulsory insurance law. See infra, n. 6.

5. S.Rep.No.1558, 77th Cong., 2d Sess., 11 (1942); H.R.Rep.No.2198, 77th Cong., 2d Sess., 6 (1942) both of which went on to express concern that "[u]nder present state laws the personal property and income of such persons may become liable for taxes in several states within the same calendar year." See also S.Rep.No.959, 78th Cong., 2d Sess., 1 (1944). Although avoidance of multiple taxation is a chief aim, a serviceman need not pay a tax covered by the Relief Act in a host state even if no similar tax is imposed in his home state. Dameron v. Brodhead, 345 U.S. 322, 73 S.Ct. 721, 97 L.Ed. 1041 (1953).

premium is simply a tax on automobiles, the proceeds of which are used for a special class of citizens—those harmed by automobiles. It likens the exaction to the 2% tax in *Buzard*, used for highway improvement.

■ We do not agree. The measure of the exaction is not the value of the vehicle; the amount of the annual contribution is based on experience and actuarial computations. And it is adjusted to reflect the length of a vehicle's stay in Puerto Rico. The exaction is, in fact, an insurance premium. As with private insurance, the premium reflects an effort to spread certain costs of personal injuries caused by motor vehicles among all those registering and maintaining such vehicles. What is significant is not the taxable wealth represented by the vehicle, but the vehicle's potential for harm when driven—a potential which gives rise to the requirement that its owner contribute to a pool of money held for the benefit of those injured or killed.

We believe it to be immaterial whether the sum is properly described as a "tax" (*see* Carmichael v. Southern Coal Co., 301 U.S. 495, 508, 57 S.Ct. 868, 81 L.Ed. 1245 (1937)) or as a form of regulatory exaction (*see* Head Money Cases, 112 U.S. 580, 595, 5 S.Ct. 247, 28 L.Ed. 798 (1884)). It is, in any event, not "taxation in respect of" personal property within the meaning of § 514. *Sullivan, supra*, 395 U.S. at 175, 89 S.Ct. 1648. Puerto Rico's exaction is most closely allied to the premium required by some states to be paid to private insurers for "compulsory" motor vehicle insurance, i. e. a policy of insurance made mandatory if one is to secure registration.[6] Such compulsory insurance is usually closely regulated by the state—the terms of the policy being prescribed by law and the amount of the premium set annually by the state. *See*, e. g., M.G.L. c. 175 § 113A et seq. We are not aware of any authority interpreting § 514 to prevent a host state from requiring a serviceman to comply with its compulsory insurance law. That Puerto Rico's compulsory insurance is administered by the state rather than by private insurers should make no difference.

We recognize that Puerto Rico's plan, being state-run and no-fault, may create a particular burden; transient servicemen may find it more difficult to obtain full premium adjustments from home-state liability insurers in view of these features (although no-fault is, of course, no longer unique, *see* M.G.L. c. 90 § 34A et seq., as amended, *and generally* Note, A Social Insurance Scheme for Automobile Accident Injuries, *supra*, n. 6 at 432–476). Puerto Rico has a substantial interest in the welfare of its citizens exposed to injury and death through the operation of motor vehicles. We do not believe that Congress meant in § 514 to exempt servicemen, whose vehicles increase the risk of injury to a host state's citizenry, from participating on the same terms as all others in the prevailing insurance requirements.[7]

---

6. Massachusetts adopted compulsory insurance as early as 1925. *See* Opinion of the Justices, 251 Mass. 569, 147 N.E. 680 (1925), upholding the scheme under the state's power to regulate highway travel for the public welfare. Although all states have some kind of financial responsibility law concerning motor vehicle operators, as of 1971 only three, Massachusetts, New York and North Carolina, had compulsory insurance laws. Note, A Social Insurance Scheme for Automobile Accident Compensation, 57 Va.L.Rev. 409, 414 (1971). There is no evidence that Congress had such insurance plans in mind when it enacted § 514 in 1942 and amended it in 1944 and 1962.

7. We add that the government has not shown that Puerto Rico's plan results in all or most cases in double exactions for transient servicemen. *See Sullivan, supra*, 395 U.S. at 180, 89 S.Ct. 1648. Puerto Rico would seem to avoid or at least reduce double exaction by prorating the premium and exempting the serviceman, while driving in Puerto Rico, from liability below stated limits, thus presumably lowering his liability insurance costs. Preliminary affidavits from some servicemen suggest that the mathematics are un-

In holding that the annual premium is not taxation in respect of property under § 514, we have considered whether it might be such by virtue of clause (2)(b) of § 514, defining "taxation" as including "licenses, fees, or excises imposed in respect to motor vehicles or the use thereof: . . ." That clause and its proviso were extensively analyzed in *Buzard, supra,* and also in *Sullivan, supra.* The words "licenses, fees or excises" were given a narrow and restricted interpretation in *Buzard.* They were held to refer "only to those taxes which are essential to the functioning of the host State's licensing and registration laws in their application to the motor vehicles of non-resident servicemen". *Buzard, supra,* 382 U.S. at 395, 86 S.Ct. at 484. In *Sullivan, supra,* 395 U.S. at 182, 89 S.Ct. 1648, the words were equated with "the motor vehicle registration fee" itself—that and no more. It seems clear, under *Buzard* and *Sullivan,* that the Puerto Rico premium is not a "license, fee or excise", and thus is not, on that ground, "taxation" within the meaning of § 514(2)(b). Moreover, not being a "license, fee or excise", the premium is not subject to the language in the proviso of clause (2)(b); we need not consider what effect, if any, to give to a serviceman's compliance or non compliance with the requirements of his home state.

Significantly, in *Sullivan, supra,* 395 U.S. at 181, 89 S.Ct. at 1655, the Supreme Court stated;

> [T]he only taxes on the *use* of property from which servicemen are exempted are the special registration taxes imposed annually by all States on the use of motor vehicles.

The "special registration taxes" referred to were the motor vehicle registration fee; in Puerto Rico, this would presumably be the $25 charge imposed for obtaining Puerto Rico "plates". Since the premium is not such a special regis-

tration tax, and since, if a tax at all, the premium taxes the use of the vehicle rather than its value, § 514 does not prohibit it.

Affirmed.

---

favorable, especially for those from one of the few compulsory insurance states, New York. But given the variety of home-state laws and the total absence of serious

data, we cannot say what financial trade-offs actually result from a serviceman's move to Puerto Rico.