UNITED STATES of America; Major Daniel M. Rowland, individually and as next friend of Mary Alice Rowland; Major Werner Hellmer, individually and as next friend of Werner K. Hellmer and Jessica R. Hellmer; Commander William Hicks, individually and as next friend of Tamara Hicks and Jason Hicks; Lieutenant Commander Harold A. Sloas, individually and as next friend of Harold Sloas, Elliott Sloas, and Susan Sloas; Captain Floyd H. Winn, individually and as next friend of Bethany Winn; Captain Charles D. Wardle, individually and as next friend of Casi Wardle and Erek Marc Downey; Master Sergeant George Bowers, individually and as next friend of Loretta Bowers, Mark Bowers, and Kevin Bowers; and Master Sergeant Paul Tipton, individually and as next friend of Paula Tipton, Gina Tipton, and Ginger Tipton, Appellees,

v.

ONSLOW COUNTY BOARD OF EDUCATION, Appellant,

and

The State of North Carolina, and James B. Hunt, Jr., Governor of North Carolina, Defendants.

UNITED STATES of America; Major Daniel M. Rowland, individually and as next friend of Mary Alice Rowland; Major Werner Hellmer, individually and as next friend of Werner K. Hellmer and Jessica R. Hellmer; Commander William Hicks, individually and as next friend of Tamara Hicks and Jason Hicks; Lieutenant Commander Harold A. Sloas, individually and as next friend of Harold Sloas, Elliott Sloas, and Susan Sloas; Captain Floyd H. Winn, individually and as next friend of Bethany Winn; Captain Charles D. Wardle, individually and as next friend of Casi Wardle and Erek Marc Downey; Master Sergeant George Bowers, individually and as next friend of Loretta Bowers, Mark Bowers, and Kevin Bowers; and Master Sergeant Paul Tipton, individually and as next friend of Paula Tipton, Gina Tipton, and Ginger Tipton, Appellees,

v.

The STATE OF NORTH CAROLINA, Appellant,

and

Onslow County Board of Education and James B. Hunt, Jr., Governor of North Carolina, Defendants.

Nos. 83–1573, 83–1574.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 31, 1983.

Decided Feb. 28, 1984.

Elizabeth C. Bunting, Asst. Atty. Gen., Raleigh, N.C. (Rufus L. Edmisten, Atty. Gen., Raleigh, N.C., on brief), and Marshall F. Dotson, Jr., Jacksonville, N.C. (Warlick, Milsted, Dotson & Carter, Jacksonville, N.C., on brief), for appellants.

Marleigh D. Dover, Appellate Staff, Civil Division, U.S. Dept. of Justice, Washington, D.C. (J. Paul McGrath, Asst. Atty. Gen., Washington, D.C., Samuel T. Currin, U.S. Atty., Raleigh, N.C., Michael F. Hertz, Appellate Staff, Civil Division, U.S. Dept. of Justice, Washington, D.C., on brief), for appellees.

Before RUSSELL, WIDENER and SPROUSE, Circuit Judges.

DONALD RUSSELL, Circuit Judge:

Onslow County, North Carolina is the location of the Marine Corps installations of Camp Lejeune and the related Marine Corps Air Station. On July 6, 1982, the Onslow County Board of Education adopted a resolution having the effect of an ordinance and requiring that all nondomiciliary students enrolled in the Onslow County public schools be charged tuition for the 1982–83 school year. The United States and several individual plaintiffs, military personnel with nondomiciliary children enrolled in the Onslow County public schools, brought this action challenging such tuition requirement. The District Court granted summary judgment in favor of the plaintiffs, on the ground that the ordinance discriminated against federally-connected persons and therefore against the federal government in violation of the Supremacy Clause of the Constitution. From such judgment defendants appeal. We affirm.

I.

As of August 1982, Camp Lejeune, one of the largest Marine Corps installations in the United States, was the base for 35,552 military personnel, with an additional complement of 4,715 civilian employees. Over 4500 military families reside off-base in Onslow County. During the 1981–82 school year, the Onslow County Board of Education operated 25 schools, with a total enrollment of 16,668 students, including 4,820 federally-connected or military dependent children.[1] Following adoption of the tuition requirement, the Board sent a total of 2,785 tuition bills, of which 2,555 were for nondomiciliary federally-connected children, and 230 for non-federally-connected children. It remains unclear from the record how these nondomiciliary students were identified, or what procedures the Board would follow to establish nondomiciliary status. These figures indicate, however, that 92% of the nondomiciliary students affected by the tuition requirement are federally-connected. The individual plaintiffs in this case, all of whom are or were stationed at Camp Lejeune residing in off-base housing,[2] are not North Carolina domiciliaries.

---

1. The separate system of Camp Lejeune Dependent Schools operated seven schools during 1981, and educated 3,952 students whose families resided on-base.

2. Two of the individual plaintiffs are no longer stationed at Camp Lejeune, and a third has transferred his child out of the Onslow County public schools, but all remain proper plaintiffs, since Onslow County has not waived tuition

They contributed to local and state government revenues by paying sales taxes, and in many instances real property taxes.

North Carolina law entitles all "children of the State" to a free elementary and secondary education. N.C.Gen.Stat. § 115C–1 (Supp.1981). Public schools are funded from a combination of sources. For the 1980–81 school year, state appropriations supplied 63.9%, mainly for current operating expenses, N.C.Gen.Stat. § 115C–426(d), while locally raised funds contributed 23.3% of the total, intended for general maintenance, capital outlay, and supplementary current expenses. Federal funding from all sources contributed the remaining 12.8%. No state-wide tax is levied to support education specifically in North Carolina; rather, all state tax receipts are pooled in the State General Fund, from which disbursements to support education and other state functions are made. Support of public schools in 1980–81 amounted to approximately 43% of total state outlays. Nearly 52% of the General Fund's receipts are derived from state income taxes and 24% comes from a general sales tax, while the remaining receipts include various specialized taxes and 7% represents non-tax revenues. Local support for the Onslow County public schools comes from the County General Fund, which like its state counterpart pools revenues from all sources, and in fiscal year 1982–83 derived 45.8% of its receipts from *ad valorem* taxes. The county's 1982–83 contribution to the Board of Education amounted to $3.6 million of a $15.8 million county budget. Onslow County's remaining substantial source of public school funding in recent years has been federal impact aid.[3] For school year 1981–82, the educational cost per pupil in Onslow County was $1,811.18, of which state contributions represented $1,249.54, local contributions $334.11, and federal aid $227.53.

Onslow County has in the past benefited from two distinct federal programs compensating in part the burden of educating federally-connected children. From 1951 through 1982, Onslow County's public schools received annual payments under the Impact Aid Program, P.L. 81–874, 20 U.S.C. § 236 *et seq.* Impact aid funds are available to defray current maintenance and operating expenses, where federal activities have burdened local educational agencies because, *inter alia,* those agencies provide education for children whose parents are employed on federal property. 20 U.S.C. § 236(3). Onslow County's public schools have qualified for impact aid in past years under 20 U.S.C. § 238(b) owing to the substantial numbers of schoolchildren residing with parents who were employed at the Marine Corps facilities but lived off-base. From an initial payment of $7,027 in fiscal year 1951, impact aid to Onslow County schools gradually rose to a peak of over one million dollars annually during fiscal years 1975–78. Thereafter, impact aid payments began to decline, although the enrollment of federally-connected children in Onslow County's schools remained the same or increased. Between fiscal years 1981 and 1982 Onslow County's impact aid fell by over one-third, from $664,634 to $404,409, because of federal budget cutbacks.[4] Before 1982, the Board had never charged tuition to nondomiciliary schoolchildren, and indeed could not charge federally-connected children for a public education while continuing to receive impact aid under P.L. 874. *See* 20 U.S.C. § 238(b).

Between 1952 and 1967, the Board also received $2,916,598 in irregular payments under the federal School Construction Assistance Program, P.L. 81–815, 20 U.S.C. § 631 *et seq.* P.L. 815 aimed to assist localities which had experienced substantial increases in enrollments of federally-connected schoolchildren. *See* 20 U.S.C. § 631. To receive this funding for construction of school facilities, the Board provided in its

charges for the already completed 1982–83 school year.

**3.** Limited funding is also derived from court fines and forfeitures used for education purposes, and from certain student fees for textbooks and activities.

**4.** Only $218,114 of the 1982 payment was actually made available during fiscal year 1982.

applications the assurance required by 20 U.S.C. § 636(b)(1)(F) that:

"The Applicant's school facilities will be available to the children for whose education contributions are provided in Public Law 815, as amended, on the same terms, in accordance with the laws of the State in which Applicant is situated, as they are available to other children in Applicant's school district."

The Board last applied for funds under P.L. 815 in 1966. At least some of the public school facilities in Onslow County built with federal aid under P.L. 815 are apparently still in use, as defendants conceded in oral argument.

Faced with significant cutbacks in federal impact aid, and believing that P.L. 874 aid would terminate altogether in 1983, the Board adopted its July 6, 1982 resolution which is the subject of this action.[5]

The Board's resolution, as its preamble indicates, was adopted pursuant to a North Carolina statute enacted in 1981 which permit local school boards to charge tuition for all nondomiciliary schoolchildren.[6] The

5. WHEREAS, the Onslow County Board of Education desires to continue to provide and maintain a quality educational program to all pupils enrolled in its schools; and,

WHEREAS, the Onslow County Board of Commissioners have not appropriated sufficient local funds to meet the budget request by the Board of Education necessary to maintain the existing level of quality education in the schools; and

WHEREAS, in the past years, the Onslow County school system has received Federal funding under Public Law 874 to provide educational costs for non-resident military dependent children residing off-base and attending schools in Onslow County; and,

WHEREAS, funding under Public Law 874 is no longer available and Congress has failed as of the date of this Resolution to appropriate funding to provide educational costs for non-resident military dependent children; and,

WHEREAS, it is anticipated that based upon prior years attendance averages, approximately two thousand non-resident military dependent children will seek enrollment in the Onslow County Public Schools; and,

WHEREAS, under North Carolina General Statutes, Section 115C–366.1, Boards of Education in North Carolina may charge tuition to persons of school age not domiciliaries of the State of North Carolina, and persons of school age who are domiciliaries of the State but who do not reside within the school district; and,

WHEREAS, the lack of adequate local funding and the loss of funds under Public Law 874 leaves the Board of Education without sufficient funds to maintain its existing level of quality education for all pupils enrolled and it is now necessary and in the best interest of the Onslow County school system and its students that tuition be charged where permitted by law,

NOW, THEREFORE be it resolved as follows:

(1) Tuition shall be charged to all persons of school age who are not domiciliaries of the State and all persons of school age who are domiciliaries of the State but who do not reside within the school district,

(2) Tuition shall not be charged in any case where there exists a written agreement with the local board of education where the student is domiciled,

(3) The amount of tuition for the 1982–1983 school year shall be $245.00 per student and shall be paid on or before the due date of regular school fees.

(4) Those persons enrolling a student in school shall be responsible for the payment of such tuition and the failure to make such payment on or before the 1st day of October shall result in the dismissal of the student.

6. N.C.Gen.Stat. § 115C–366.1, as amended in 1982, reads as follows:

(a) Local boards of education may charge tuition to the following persons:

(1) Persons of school age who are not domiciliaries of the State.

(2) Persons of school age who are domiciliaries of the State but who do not reside within the school administrative unit or district.

(3) Persons of school age who reside on a military or naval reservation located within the State and who are not domiciliaries of the State. Provided however, that no person of school age residing on a military or naval reservation located within the State and who attends the public schools within the State may be charged tuition if federal funds designed to compensate for the impact on public schools of military dependent persons of school age are funded by the federal government at not less than fifty percent (50%) of the total per capita cost of education in the State, exclusive of capital outlay and debt service, for elementary or secondary pupils, as the case may be, of such school administrative unit.

(b) The tuition charge for a student shall not exceed the amount of per pupil local funding.

(c) The tuition required in this section shall be determined by local boards of education

Board has agreed not to invoke the dismissal sanction for nonpayment while this case is pending. The U.S. Department of Education has informed the Board that it no longer qualifies for impact aid under P.L. 874 because of the ordinance, and has withheld a preliminary 1983 payment.

Plaintiffs raise four issues in their challenge to the Board's tuition requirement. First, does denial of a free public education to nondomiciliary federally-connected schoolchildren breach the contractual assurance made by the Board in return for receipt of school construction funds under P.L. 815? Second, is the Board's ordinance preempted under the Supremacy Clause because of conflict with a general policy embodied in the Soldiers' and Sailors' Civil Relief Act of 1940, 50 U.S.C.App. § 574(1), of relieving military personnel from double state taxation? Third, does the Board's ordinance discriminate against federally-connected persons and therefore against the federal government in violation of the Supremacy Clause? Fourth, does the Board's ordinance deny equal protection of the laws in violation of the Fourteenth Amendment? We consider each issue in turn, noting that the District Court's judgment only directly addressed the validity of the Board's ordinance and not the enabling North Carolina statute. Our inquiry is similarly limited.

## II.

■ Although the parties have chosen to address their contractual issue last, and instead emphasize their constitutional arguments, we are mindful of the general principle that dispositive non-constitutional issues are to be treated before reaching constitutional matters. *See, e.g., Wolston v. Reader's Digest Association, Inc.,* 443 U.S. 157, 160–61, n. 2, 99 S.Ct. 2701, 2703–04 n. 2, 61 L.Ed.2d 450 (1979).

■ Clearly, the Board applied for and used federal aid for school construction authorized by P.L. 815, and in return for that aid granted on several occasions between 1952 and 1967 offered written assurances each August 1 prior to the beginning of a new school year.

that federally-connected children would receive a public education on the same terms as other children in Onslow County. These assurances are contractual in nature, and the United States is entitled to sue for specific performance of that contract, by way of injunctive relief. *United States v. Sumter County School District No. 2,* 232 F.Supp. 945, 950–51 (E.D.S.C.1964). *See also United States v. County School Board of Prince George County, Virginia,* 221 F.Supp. 93, 100 (E.D.Va.1963). Thus, the only real dispute is over the duration of the contractual obligation to provide a free education to federally-connected schoolchildren in Onslow County. Plaintiffs contend that the obligation lasts so long as school facilities constructed with federal funds under P.L. 815 are still in use in Onslow County. Defendants believe that any obligation to provide a free education beyond the year in which the construction aid was actually awarded is conditioned on the continuing availability of impact aid payments for current maintenance and operating expenses under P.L. 874. The District Court found for defendants on this issue, stating that the parties did not anticipate "the magnitude of funding cutbacks for yearly operating expenses which occurred over the recent past," and that "[b]ecause interpretation of the contract assurances to provide a free education without continuing the yearly aid would impose large, unanticipated expenditures on the Board, plaintiffs' contract claim must fail."

■ We believe, however, that plaintiffs' interpretation is correct. School construction aid under P.L. 815 and impact aid under P.L. 874 are distinct programs serving distinct purposes. Funding is applied for separately under each, and neither the school construction aid statute's language nor its legislative history furnishes any indication that Congress intended to create the sort of linkage between the programs that defendants allege. The Board claims that it applied for P.L. 815 funds "under the context" or with the "understanding" that impact aid under P.L. 874 would continue to

be available, but offers no factual basis whatsoever, either in the statutes or in statements by federal officials, for the belief that its contractual obligation entered into in return for P.L. 815 funding was in any way so conditioned, expressly or impliedly. It is not the province of the courts, in the absence of Congressional intent, to manufacture an escape clause for the Board merely on policy grounds.

*Pennhurst State School v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), relied on by defendants and the District Court, is inapposite. Though the Supreme Court held in *Pennhurst* that a state must "voluntarily and knowingly" accept a contractual obligation imposed in return for federal funds to be bound, and that "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously," 451 U.S. at 17, 101 S.Ct. at 1539, *Pennhurst* posed a quite different issue from that we now face. There, the question was whether a "bill of rights" provision in the Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. § 6000 *et seq.* (1976 & Supp.III), created substantive rights for the developmentally disabled which could be enforced against those states which had accepted federal funding under the Act. The "bill of rights" provision, § 6010, lacked any explicit language making it a "condition" of accepting federal funds, in sharp contrast to other sections of the Act, as the Court recognized. 451 U.S. at 13, 23, 101 S.Ct. at 1537, 1543. Furthermore, the Court found that nothing in the Act revealed an intent to require the States to fund new substantive rights, and that Congress intended the Act to be no more than a funding statute. *Id.* at 18, 22, 101 S.Ct. at 1540, 1542. The Secretary of Health and Human Services, charged with administering the Act, did not believe that § 6010 imposed conditions on participating states. *Id.* at 23, 25, 101 S.Ct. at 1543, 1544. The statute before us requires that the assurance given by the Board be included in each application for federal funds, and before any application can be approved the responsible federal official must find that the assurance has been given. 20 U.S.C.

§ 636(b)(1), (2). There is no indication in any of the evidence that any federal officials have ever read P.L. 815 as a mere funding statute. The crucial point distinguishing this case from *Pennhurst* is that here the *Board,* not the federal government, is trying to create an implied condition attached to the receipt of federal funds; the Board's acceptance of an obligation is clearly stated in each P.L. 815 application. Congress unambiguously imposed, and the Board explicitly accepted, the condition expressed in § 636(b)(1)(F) in return for P.L. 815 school construction funds.

■ Before us, then, is a familiar problem in contract interpretation of trying to discern the intent of the parties at the time the contract was made; in this case we seek to resolve the uncertainty as to the duration of the obligation accepted by the Board. The key to this problem lies in recognition that P.L. 815 funds represent long-term capital outlays, as distinguished from the aid for current expenditures provided under P.L. 874. It is noteworthy that assurances of equal education for federally-connected and resident children are required by P.L. 815 but not by P.L. 874; presumably Congress realized a need to protect its long-term investment under P.L. 815, while the need for such a safeguard was thought unnecessary in a program covering only current expenses, where renewal of aid could simply be granted or denied on an annual basis. We find it incredible as a matter of law to suppose that the Board believed that its obligation would expire following the school year in which it received P.L. 815 funds, even though facilities built with that aid could have decades of useful life. The Board's assurances are hardly "stale," as defendants would have us believe, when facilities built with federal aid are still being used by the Board. With the benefit must run the burden. The only court which has, to our knowledge, specifically addressed the question of the duration of a § 636(b)(1)(F) assurance has held that "[t]hese contractual assurances will continue to be binding on the board at least as long as it continues to use the facilities

constructed with the funds for which the assurances were given." *Lemon v. Bossier Parish School Board*, 240 F.Supp. 709, 714 (W.D.La.1965), *aff'd*, 370 F.2d 847 (5th Cir.), *cert. denied*, 388 U.S. 911, 87 S.Ct. 2116, 18 L.Ed.2d 1350 (1967). We now adopt this holding as our own, and find that the Board has breached its contractual obligation.

### III.

Notwithstanding our holding in favor of plaintiffs' contractual claim, we find it proper to address plaintiffs' twin Supremacy Clause challenges to the Board's tuition requirement as well. Since the record does not reveal how close the Onslow County public school facilities built with federal money are to obsolescence, considerations of finality impel us to reach constitutional issues that would inevitably be raised at a later date and possibly in the immediate future. These issues are now ripe for adjudication, and no useful purpose would be served by delaying their resolution.

The Soldiers' and Sailors' Civil Relief Act of 1940, 50 U.S.C.App. § 501 *et seq.*, was enacted "to provide for, strengthen, and expedite the national defense" by suspending certain civil liabilities of military personnel "in order to enable such persons to devote their entire energy to the defense needs of the Nation." 50 U.S.C. App. § 510. To this end, § 514 of the Act, as amended, 50 U.S.C.App. § 574(1), provides that the residence or domicile of a person is not affected by absence from a state in compliance with military or naval orders, and immunizes military personnel from taxation of income or personal property where such persons are not residents or domiciliaries. Plaintiffs contend that this statute embodies a general policy of relieving military personnel from multiple state taxation, and that because the Board's tuition requirement would result in double taxation to support public schools, it must be preempted under the Supremacy Clause of the federal Constitution. U.S. Const., art. VI, cl. 2. The District Court found that preemption would ordinarily be required, but that the Tenth Amendment to the Constitu-

tion acted to bar preemption. We concur with the District Court as to the former point, but disagree on the applicability of the Tenth Amendment.

It has long been recognized that state enactments which "interfere with, or are contrary to the laws of congress, made in pursuance of the constitution" must yield to federal preemption. *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211, 6 L.Ed. 23 (1824). We deal here with preemption arising from an alleged actual conflict between federal and state law, and not with any purported federal occupation of an entire field. *See generally*, L. Tribe, American Constitutional Law, 376–86 (1978). While most preemption decisions have arisen from an exercise of federal power under the Commerce Clause, U.S. Const., art. I, § 8, cl. 3, similar principles apply to preemption analysis when Congress enacts legislation under its other constitutional powers. *See, e.g., Perez v. Campbell*, 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971) (preemption owing to conflict between state statute and policy underlying federal Bankruptcy Act). *See also* L. Tribe, *supra*, at 390. We are required to perform a two-step analysis of "first ascertaining the construction of the two statutes and then determining the constitutional question whether they are in conflict." *Chicago & North Western Transportation Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 317, 101 S.Ct. 1124, 1130, 67 L.Ed.2d 258 (1981), *quoting Perez*, 402 U.S. at 644, 91 S.Ct. at 1708. Preemption may occur whether the conflict is explicit from the language of the federal statute or "implicitly contained in its structure and purpose." *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977). In either case, we seek to determine whether the state enactment "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Chicago*, 450 U.S. at 317, 101 S.Ct. at 1130, *quoting Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

The federal statute in question does not explicitly conflict with the Board's ordi-

nance, since it only reaches state taxation of income and personal property. As the Supreme Court has recognized, however, § 574(1) serves the general purpose of relieving military personnel of the burden of supporting the government of the state where present solely in compliance with military orders. *California v. Buzard,* 382 U.S. 386, 393, 86 S.Ct. 478, 483, 15 L.Ed.2d 436 (1966). The chief concern of the drafters of this statute was the danger of "multiple state taxation of the property and income of military personnel." H.Rep. No. 2198, 77th Cong., 2d Sess. 6 (1942); S.Rep. No. 1558, 77th Cong., 2d Sess. 11 (1942). *See also United States v. County of Champaign, Illinois,* 525 F.2d 374, 377 (7th Cir. 1975); *United States v. Commonwealth of Puerto Rico,* 478 F.2d 451, 454 (1st Cir.1973). *Cf. Dameron v. Brodhead,* 345 U.S. 322, 326, 73 S.Ct. 721, 723, 97 L.Ed. 1041 (1953) ("though the evils of potential multiple taxation may have given rise to this provision," Congress reserved "the sole right of taxation to the state of original residence whether or not that state exercised the right.") Thus, the Supreme Court has found that sales or use taxes imposed upon military personnel are not prohibited by § 574(1), because such taxes are by their nature imposed only once and then only where there has been a retail sales transaction. *Sullivan v. United States,* 395 U.S. 169, 175–77, 89 S.Ct. 1648, 1652–53, 23 L.Ed.2d 182 (1969). Similarly, Congress did not include real property taxes within the statutory prohibition; real property can have but a single situs for tax purposes.

■ Defendants would have us view the tuition charge as akin to a user fee for services provided. State labels, however, are not conclusive; federal law determines the construction to be given to this payment. *California v. Buzard,* 382 U.S. at 393, 86 S.Ct. at 483. Given our analysis of North Carolina's financing of public schools in Part I, *supra,* it is evident that this tuition charge is merely a tax substitute. North Carolina has not chosen to finance its

schools primarily through tuition charges assessed against individual students, nor exclusively by taxes of the permitted sort under § 574(1). Income taxes represent more than half of the State General Fund's receipts, and that Fund in turn supplies the greatest part of the per pupil cost of education.[7] That North Carolina has chosen to pool tax revenues in the General Fund is not dispositive; plainly, if nondomiciliary military personnel paid the same income taxes as state residents to North Carolina, the General Fund would be considerably augmented and a tuition charge would be needless, for the state could assume the educational burden for nondomiciliaries at little or no additional expense to residents. We find that the Board's tuition charge is but an ill-disguised replacement for those taxes that North Carolina cannot impose on military personnel who are nondomiciliaries because of § 574(1), and for which the Board no longer considers federal impact aid under P.L. 874 adequate compensation.

■ Having construed the statute and ordinance in question, we now determine whether conflict is present, bearing in mind that provisions of the Relief Act "must be read with an eye friendly to those who dropped their affairs to answer their country's call." *LeMaistre v. Leffers,* 333 U.S. 1, 6, 68 S.Ct. 371, 373, 92 L.Ed. 429 (1948). We find persuasive the Supreme Court's reasoning in the recent decision of *Toll v. Moreno,* 458 U.S. 1, 102 S.Ct. 2977, 73 L.Ed.2d 563 (1982). There, a state-operated university granted preferential treatment for purposes of tuition and fees to students with "in-state" status. Citizens and immigrant aliens could obtain such status upon showing of state domicile, but nonimmigrant aliens were categorically denied in-state status even if domiciled. The Court found that insofar as this policy barred domiciled nonimmigrant aliens holding G–4 visas from acquiring in-state status, it violated the Supremacy Clause. 458 U.S. at 17, 102 S.Ct. at 2986. G–4 visas are issued to nonimmigrant aliens who are officers or

---

**7.** The facts before us do not permit a similar assessment of the role of taxes on personal property in North Carolina public school finance.

employees of certain international organizations and their immediate families. These aliens are relieved of federal and many state and local taxes on salaries paid by their organizations as the result of an array of treaties, international agreements, and federal statutes. *Id.* at 4, 14, 102 S.Ct. at 2979, 2984. Such tax benefits serve as an inducement for international organizations to locate significant operations in the United States, *Id.* at 16, 102 S.Ct. at 2985. The Court determined that the university's imposition of higher tuition and fees on G–4 domiciled aliens than on other domiciliaries frustrated federal policies. "The State may not recoup indirectly from respondents' parents the taxes that the Federal Government has expressly barred the State from collecting." *Id.* While *Toll* does not formally control the result in this case, as it dealt with a distinction between different classes of domiciliaries, the situation it presented is analogous to that we face. Military personnel are threatened with a greater burden of supporting the public schools than other citizens if they may be taxed to support education in their state of residence and also in the state where they are stationed with their families. Plaintiffs have argued that military enlistment and morale might suffer as a result. Surely, the federal interests at stake here are no less substantial than were present in *Toll*. While *Toll's* result rested in part on "the preeminent role of the Federal Government with respect to the regulation of aliens within our borders," *Id.* at 10, 102 S.Ct. at 2982, we believe that a statute such as § 574(1), evidently enacted as a "necessary and proper" means to effectuate the War Powers of Congress [8] under Article I, Section 8, Clause 18 of the Constitution, *Dameron,* 345 U.S. at 325, 73 S.Ct. at 723, is entitled to no less deference. Congress unquestionably plays a predominant role over the states in formulating military policy under the Constitution. Accordingly, we find that the Board's tuition requirement presents the danger of multiple state taxation of mili-

tary personnel that Congress aimed to prevent by enacting § 514 of the Relief Act, 50 U.S.C.App. § 574(1), and we hold the Board's ordinance unconstitutional under the Supremacy Clause.

The Tenth Amendment affords no defense to preemption here. It has long been accepted, as a matter of constitutional theory, that the Tenth Amendment's allocation of powers between the federal and state governments "states but a truism that all is retained which has not been surrendered," and does not deprive the federal government of "authority to resort to all means for the exercise of a granted power which are appropriate and plainly adapted to the permitted end." *United States v. Darby,* 312 U.S. 100, 124, 61 S.Ct. 451, 462, 85 L.Ed. 609 (1941). As Chief Justice Marshall declared in *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 405, 4 L.Ed. 579 (1819), "the government of the Union, though limited in its powers, is supreme within its sphere of action." Thus, the Tenth Amendment has typically been understood as a rule of construction, simply reserving to the states any residual powers which the federal government cannot without pretext claim as either enumerated or implied, and which are not barred to government at any level by express constitutional proscriptions. *See, e.g., McCulloch,* 17 U.S. (4 Wheat.) at 406, 421, 423. *See also* 2 J. Story, Commentaries on the Constitution §§ 1907–08 (2d ed. 1851): "It is plain, therefore, that it could not have been the intention of the framers of this amendment to give it effect, as an abridgement of any of the powers granted under the constitution, whether they are express or implied, direct or incidental. Its sole design is to exclude any interpretation, by which other powers should be assumed beyond those which are granted."

Recently, the Supreme Court has articulated a new reading of the Tenth Amendment where Congress has legislated under the Commerce Clause. In *National League*

---

**8.** The War Powers are embodied in Article I, Section 8 of the federal Constitution, and include, *inter alia,* the powers to "declare War,"

cl. 11, "raise and support Armies," cl. 12, and "provide and maintain a Navy," cl. 13.

of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), the Court found unconstitutional the 1974 amendments to the Fair Labor Standards Act of 1938, 29 U.S.C. § 201 et seq., which had extended to almost all employees of state governments and their political subdivisions the minimum wage and maximum hours provision of the Act. Justice Rehnquist's opinion for the Court recognized that although the 1974 amendments were within the scope of Congressional power under the Commerce Clause, 426 U.S. at 840–41, 96 S.Ct. at 2469, the Tenth Amendment and general principles of federalism operated to invalidate legislation under the Commerce Clause that would "directly displace the States' freedom to structure integral operations in areas of traditional governmental functions." Id. at 852, 96 S.Ct. at 2474. Justice Blackmun, as the fifth member of the majority, made clear in his concurrence that federal power could still be exercised notwithstanding concerns over state sovereignty where the federal interests are "demonstrably greater" and state compliance is essential. Id. at 856, 96 S.Ct. at 2476 (Blackmun, J., concurring).

Subsequently, in a decision upholding the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. § 1201 et seq., against a Tenth Amendment challenge, Hodel v. Virginia Surface Mining & Reclamation Association, Inc., 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981), a majority on the Supreme Court made clear that sufficiently strong federal interests can override a Tenth Amendment claim under the National League of Cities doctrine. The Court first enumerated three conditions which are each necessary to a claim of Tenth Amendment invalidity, drawing upon National League of Cities:

"First, there must be a showing that the challenged statute regulates the 'States as States.' Second, the federal regulation must address matters that are indisputably 'attribute[s] of state sovereignty.' And third, it must be apparent that the States' compliance with the federal law would directly impair their ability 'to structure integral operations in areas of traditional governmental functions.'"

Hodel, 452 U.S. at 287–88, 101 S.Ct. at 2365–66. Nonetheless,

"Demonstrating that these three requirements are met does not ... guarantee that a Tenth Amendment challenge to congressional commerce power action will succeed. There are situations in which the nature of the federal interest advanced may be such that it justifies state submission."

Id. at 288 n. 29, 101 S.Ct. at 2366 n. 29. This language has been reaffirmed recently in Equal Employment Opportunity Commission v. Wyoming, 460 U.S. 226, ___, 103 S.Ct. 1054, 1060–61, 75 L.Ed.2d 18 (1983).

Section 514 of the Relief Act, 50 U.S.C. App. § 574, clearly imposes direct limitations on the taxing power of the states as states, rather than merely regulating private parties and only affecting the states indirectly. Cf. Hodel, 452 U.S. at 288–93, 101 S.Ct. at 2366–69. (Surface Mining Act regulated only private individuals and businesses subject to both federal and state sovereignty). Since a state's power to tax is indisputably an attribute of its sovereignty, the second element of the Hodel test is also met. On the third element of the Hodel test, however, we disagree with defendants and the District Court. Education is certainly an important state function, and apparently is a "traditional" one for purposes of Tenth Amendment analysis. National League of Cities, 426 U.S. at 855, 96 S.Ct. at 2476. We are, however, far from certain that North Carolina's ability to structure "integral operations" will be so impaired by the Relief Act that the state's "separate and independent existence," National League of Cities, Id. at 851, 96 S.Ct. at 2474, quoting Coyle v. Smith (Oklahoma), 221 U.S. 559, 580, 31 S.Ct. 688, 695, 55 L.Ed. 853 (1911), will be endangered. In this analysis, "particularized assessments of actual impact" are not crucial. National League of Cities, 426 U.S. at 851, 96 S.Ct. at 2474. Rather, as the Supreme Court recognized in Equal Employment Opportunity Commission v. Wyoming, a more general-

ized legal inquiry into "the direct and obvious effect of the federal legislation on the ability of the States to allocate their resources" is required. *Id.,* 460 U.S. at ___, 103 S.Ct. at 1063. Unlike the 1974 amendments to the Fair Labor Standards Act, which applied to virtually all state employees and would have imposed economic restrictions on the "States' ability to structure operations and set priorities over a wide range of decisions." *Id.,* here the federal legislation burdens only those few localities in any state which are home to large federal military installations. Furthermore, those localities derive considerable benefit from the presence of military bases such as Camp Lejeune, in the form of employment for local civilians, availability of tens of thousands of servicemen as consumers, and increased revenues from sales and real property taxes. Some restructuring of state and local educational financing may well be necessary if the Board cannot charge tuition to federally-connected non-domiciliaries, but any claim that North Carolina will have such difficulty in raising the required revenues that its "separate and independent existence" will be endangered warrants our skepticism.

Even if all three elements of the *Hodel* test were met, we would be justified in finding an overriding federal interest in attracting and retaining military personnel. In *Peel v. Florida Department of Transportation,* 600 F.2d 1070 (5th Cir.1979), the Fifth Circuit engaged in just such a comparison of federal and state interests, as contemplated by Justice Blackmun in *National League of Cities,* and rejected a Tenth Amendment challenge to the power of a federal court to order a state agency to reinstate a former employee pursuant to the Veterans' Reemployment Rights Act, 38 U.S.C. §§ 2021–26. That Act, like the one before us, rests on the authority of the War Powers. *Peel,* 600 F.2d at 1072. The *Peel* court described the War Powers as among the "vital powers of Congress, essential to the protection of the nation," and held that where "Congress has acted in a direct manner under its war power and has not unduly encroached upon the state's integral gov-

ernmental functions, the tenth amendment is not a limitation on its power." *Id.,* at 1084. Here, the District Court has sought to tip the balance in favor of the state with two arguments, neither of which we find persuasive. First, the District Court asserted that national interests are "different in kind and degree" where legislation under the War Powers is examined in peacetime rather than in an hour of conflict, and the legislation is "financial" in nature. Congressional power to raise and maintain military forces, however, is in no way conditioned on the imminence of conflict. Indeed, it may be plausibly argued that a peacetime volunteer military, dependent on financial incentives for recruitment, is more in need of protection from double state taxation than a conscripted force. If "financial" legislation could not be sustained under the War Powers against a Tenth Amendment challenge, it would be difficult to explain the result in *Peel,* or in *Case v. Bowles,* 327 U.S. 92, 66 S.Ct. 438, 90 L.Ed. 552 (1946), in which the Supreme Court sustained the Emergency Price Control Act's imposition of a ceiling price on sales of state timber notwithstanding the Tenth Amendment. The Court in *Case* recognized that the Price Control Act was a valid exercise of the War Powers, and rejected a proposed limitation on federal power where "essential" state functions were affected, dismissing such a criterion as "unworkable." 327 U.S. at 101, 66 S.Ct. at 443. The Supreme Court has expressly left *Case* unaffected by *National League of Cities,* 426 U.S. at 854–55 n. 18, 96 S.Ct. at 2475 n. 18. *See also United Transportation Union v. Long Island Rail Road Co.,* 455 U.S. 678, 684 n. 9, 102 S.Ct. 1349, 1353 n. 9, 71 L.Ed.2d 547 (1982).

Second, the District Court sought to dilute the precedential strength of *Toll,* which had upheld federal imposition of a financial burden on state higher education without addressing the Tenth Amendment's effect, by emphasizing the greater role of localities in financing primary and secondary education. While it is true that localities are less able to spread the expense of educating

federally-connected children than is the state as a whole, the facts before us reveal that North Carolina already shoulders the greater part of the public education burden. Moreover, the Supreme Court has stated that the nature of federal action is the determinative factor in Tenth Amendment analysis, and that an adverse impact on state and local economies alone is insufficient to establish a Tenth Amendment violation. *Hodel,* 452 U.S. at 292–93, n. 33, 101 S.Ct. at 2368–69, n. 33.

 Finally, there is a more fundamental objection to invocation of a Tenth Amendment defense here. Even if a Tenth Amendment violation would exist had the Relief Act been enacted under Congress' commerce power, we believe that the doctrine of *National League of Cities* has no applicability where Congress has acted under the War Powers. For in *National League of Cities* the Court refused to overrule *Case,* and noted, "[n]othing we say in this opinion addresses the scope of Congress' authority under its war power." 426 U.S. at 854–55 n. 18, 96 S.Ct. at 2475–76 n. 18. Since *National League of Cities* reserved the issue of whether Congressional action under either the War Powers, or other sources of authority such as the spending power, art. I, § 8, cl. 1, or § 5 of the Fourteenth Amendment, 426 U.S. at 852 n. 17, 96 S.Ct. at 2474 n. 17, could ever be circumscribed by the Tenth Amendment, the Court has never applied *National League of Cities* beyond its original Com-

merce Clause context. *See EEOC v. Wyoming,* 460 U.S. 226, ___, 103 S.Ct. 1054, 1064–65, 75 L.Ed.2d 18; *Federal Energy Regulatory Commission v. Mississippi,* 456 U.S. 742, 758, 102 S.Ct. 2126, 2136–37, 72 L.Ed.2d 532 (1982); *United Transportation Union* 455 U.S. at 682–83, 102 S.Ct. at 1352–53; *Hodel,* 452 U.S. at 281, 101 S.Ct. at 2362. This Circuit's Tenth Amendment decisions following *National League of Cities* read the Supreme Court's doctrine as linked to the Commerce Clause, and as inapplicable where Congress acts under § 5 of the Fourteenth Amendment. *Arritt v. Grisell,* 567 F.2d 1267, 1270–71 (4th Cir.1977) (Age Discrimination in Employment Act); * *Usery v. Charleston County School District,* 558 F.2d 1169, 1170–71 (4th Cir.1977) (Equal Pay Act). The Supreme Court's recent opinions have confirmed our position, with regard to Congress' Fourteenth Amendment enforcement power. *EEOC v. Wyoming,* 460 U.S. at ___ n. 18, 103 S.Ct. at 1064 n. 18; *Hodel,* 452 U.S. at 287 n. 28, 101 S.Ct. at 2365 n. 28; *City of Rome v. United States,* 446 U.S. 156, 179, 100 S.Ct. 1548, 1562, 64 L.Ed.2d 119 (1980). We see little danger that Congressional legislation pursuant to the War Powers, which must be related to the nation's ability to "carry on war," *Case,* 327 U.S. at 102, 66 S.Ct. at 443, will ultimately deprive the states of any significant role in our federal system, as might unchecked exercise of the Congressional commerce power.[9] The matters with

* While *Arritt v. Grisell* stands for the proposition for which it has been cited, we do not intend to express an opinion as to the extent to which particular public professions, firefighters for example, may be subjected to federal legislation at odds with state legislation.

9. In *National League of Cities,* the Court was concerned that unchecked federal power could "devour the essentials of state sovereignty," 426 U.S. at 855, 96 S.Ct. at 2476, *quoting Maryland v. Wirtz,* 392 U.S. 183, 205, 88 S.Ct. 2017, 2028, 20 L.Ed.2d 1020 (1968) (Douglas, J., dissenting), *rev'd. National League of Cities,* 426 U.S. 833, 855, 96 S.Ct. 2465, 2476, 49 L.Ed.2d 245. The Commerce Clause evidently presents the greatest danger that federal absolutism will deprive the states of their traditional police and social welfare powers, for it is a "grant of plenary authority to Congress," 426 U.S. at

840, 96 S.Ct. at 2469, under which "[e]ven activity that is purely intrastate in character may be regulated by Congress, where the activity, combined with like conduct by others similarly situated, affects commerce among the States or with foreign nations." *Fry v. United States,* 421 U.S. 542, 547, 95 S.Ct. 1792, 1795, 44 L.Ed.2d 363 (1975). The commerce power reaches with nearly unlimited breadth to regulation of "the use of channels of interstate or foreign commerce which Congress deems are being misused," "protection of the instrumentalities of interstate commerce," and "activities affecting commerce." *Perez v. United States,* 402 U.S. 146, 150, 91 S.Ct. 1357, 1359, 28 L.Ed.2d 686 (1971). Unlike the spending power, which at least permits the states to decline participation in federal programs at the price of foregoing federal funding, the commerce power

which the War Powers deal are national in character, and the states play no role in formulating military policy or providing for the national defense, apart from the rights which the Constitution expressly reserves to the states of "Appointment of the Officers" and "the Authority of training the Militia." U.S. Const., art. I, § 8, cl. 16. Following *Case v. Bowles,* we hold that the Tenth Amendment analysis which has uniformly prevailed prior to *National League of Cities* still governs the validity of Congressional action under the War Powers, and that because the provision of the Relief Act here in question was properly enacted pursuant to Congress' enumerated War Powers and the Necessary and Proper Clause it is constitutional as applied to the states and their subdivisions notwithstanding the Tenth Amendment.[10]

## IV.

██ The District Court found the Board's tuition ordinance unconstitutional under the Supremacy Clause because it discriminated against federally-connected persons, i.e., nondomiciliary military personnel and their dependents, and therefore discriminated against the federal government. We agree with the District Court's conclusion on this issue.

██ Since the early years of the Republic, the Supreme Court has consistently held that the Supremacy Clause immunizes the United States and its instrumentalities from state taxation, commencing with the fountainhead case of *McCulloch v. Mary-*

*land,* 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819). State taxation of federal employees, however, is constitutional if nondiscriminatory. *Graves v. New York ex rel. O'Keefe,* 306 U.S. 466, 59 S.Ct. 595, 83 L.Ed. 927 (1939). For a tax that does not fall directly on the United States to be invalid, it must operate "so as to discriminate against the Government or those with whom it deals." *United States v. City of Detroit,* 355 U.S. 466, 473, 78 S.Ct. 474, 478, 2 L.Ed.2d 424 (1958). The Supreme Court's most recent formulation of this principle states that "the economic burden on a federal function of a state tax imposed on those who deal with the Federal Government does not render the tax unconstitutional so long as the tax is imposed equally on the other similarly situated constituents of the State." *United States v. County of Fresno,* 429 U.S. 452, 462, 97 S.Ct. 699, 704, 50 L.Ed.2d 683 (1977). *See also Memphis Bank & Trust Co. v. Garner,* 459 U.S. 392, 397 & n. 7, 103 S.Ct. 692, 696 & n. 7, 74 L.Ed.2d 562 (1983); *Washington v. United States,* 460 U.S. 536, ___, 103 S.Ct. 1344, 1351–52, 75 L.Ed.2d 264 (1983); *cf. United States v. New Mexico,* 455 U.S. 720, 735 n. 11, 102 S.Ct. 1373, 1383 n. 11, 71 L.Ed.2d 580 (1982) ("state taxes on contractors are constitutionally invalid if they discriminate against the Federal Government, or substantially interfere with its activities"). The *Fresno* principle emphasizes the danger of state abuse of the taxing power where political checks are absent. 429 U.S. at 462–64, 97 S.Ct. at 704–05. As the Court recognized:

permits Congress to compel state acquiescence while offering nothing in return. Because, in the context of the modern reading of the Commerce Clause, the Tenth Amendment read merely as a rule of construction would be a "dead letter," S. Barber, *National League of Cities v. Usery: New Meaning for the Tenth Amendment,* 1976 Sup.Ct.Rev. 161, 170, the Court has transformed it into a prohibition on the exercise of federal power akin to other limitations contained in the Bill of Rights, but affording its protection to states rather than private individuals. *See National League of Cities,* 426 U.S. at 845, 96 S.Ct. at 2471. One commentator has observed: "Recent developments indicate that *League of Cities* is no more than a shotgun in the closet for use on special occasions when the Court believes Congress

has gone too far under the commerce clause." K. Flax, *In the Wake of National League of Cities v. Usery: A "Derelict" Makes Waves,* 34 S.C.L.Rev. 649, 655 (1983).

10. *Peel* refused to hold that any exercise of Congress' War Powers would be immune from Tenth Amendment limitations. 600 F.2d at 1084 n. 16. The Fifth Circuit there recognized that other courts, including this Circuit, had limited *National League of Cities* to the Commerce Clause context, but chose to apply the *National League of Cities* analysis to War Powers legislation because the Supreme Court had not yet resolved the issue of that decision's reach. *Id.* at 1083.

"A tax on the income of federal employees... if imposed only on them, could be escalated by a state so as to destroy the federal function performed by them either by making the Federal Government unable to hire anyone or by causing the Federal Government to pay prohibitively high salaries. This danger would never arise, however, if the tax is also imposed on the income and property interests of all other *residents and voters* of the State."

*Id.* at 463 n. 11, 97 S.Ct. at 705 n. 11 (emphasis added).

Beyond any doubt, if United States military personnel and their dependents were the only persons subjected to the Board's tuition tax, the tax would be found unconstitutional. The issue, then, is whether the inclusion of a handful of non-federally-connected persons in a class composed of 92% federally-connected individuals can salvage the tax. The Board would have us regard the tax as a facially neutral imposition on all nondomiciliaries, free of discriminatory taint. But nondomiciliaries have no right to vote in North Carolina. *See* N.C.Gen. Stat. § 163–55 (1982); *Owens v. Chaplin*, 228 N.C. 705, 47 S.E.2d 12 (1948); *Hall v. Wake County Board of Elections*, 280 N.C. 600, 187 S.E.2d 52 (1972). Therefore, no one in the taxed class is capable of resorting to the political processes of North Carolina to oppose the tax, and a Supremacy Clause challenge is the only recourse of the federal employees.

■ Ordinarily, as defendants argue, official motivation in enacting a tax affecting federal employees is irrelevant, and only the discriminatory effect of a tax is considered in a Supremacy Clause analysis. But where the Board seeks to tax a politically impotent class, we believe it appropriate to consider the reasons therefor in determining whether discrimination against federal employees is present. Since political checks are absent, the only reasonable way to protect the rights of federal employees apart from an intent analysis would be *per se* invalidation of any tax distinctions

between residents and non-residents where federal employees are in the non-resident class, and that route would be far harsher for state and local governments. Here, a reading of the preamble to the Board's tuition resolution affords conclusive evidence of a discriminatory *animus* directed at the United States and its employees.[11] As the District Court put it below:

"The reason the Board believes it cannot offer quality education is because there are too many federally-connected children in the public schools and the school system is receiving too little help from the federal government. The Board's objective is to recoup revenues lost from federal budget cuts. Although couched in terms of non-domiciliaries, the Board specifically attempted to recoup federal funds from federally-connected dependents. It is therefore a discriminatory attack against government employees and cannot stand."

### V.

Given our disposition of the other issues in this case, we, like the District Court, have no occasion to address plaintiffs' equal protection claim.

### VI.

We do not doubt the Board's genuine concern over providing a quality education for all school-children in Onslow County. Federally-connected children and their parents in the military, however, have been caught in a political and fiscal crossfire between the federal, state, and local governments, a battle not of their own making. The federal Constitution will not abide this attempt by the Onslow County Board of Education to balance its school budgets at the expense of those who have undertaken to serve our country in arms.

Accordingly, the judgment of the District Court is

AFFIRMED.

WIDENER, Circuit Judge, concurring:

I concur in the result as well as in all of the opinion through parts I and II thereof.

---

11. See footnote 5 *supra.*

I would not decide the constitutional questions since there are other grounds upon which the decision is properly based.

The rule is stated in *Ashwander v. TVA,* 297 U.S. 288, 341, 347, 56 S.Ct. 466, 480, 483, 80 L.Ed. 688 (1936) (Justice Brandeis concurring).

"The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of. This rule has found most varied application. Thus, if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter."